UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


LAWRENCE MURRELL JR.,    :
    Petitioner      :
             :    CASE NO. 1:13-CV-2573
    v.           :
             :    (Judge Caldwell)
SUPERINTENDENT NANCY GIROUX,  :
    Respondent[1]    :


*M E M O R A N D U M*

Petitioner Lawrence Murrell Jr. ("Murrell"), an inmate at the State

Correctional Institution in Albion, Pennsylvania, challenges his state-court conviction and

sentence of life imprisonment without parole for first-degree murder, criminal conspiracy,

and abuse of a corpse. Murrell's claims for relief, pursuant to 28 U.S.C. § 2254, are ripe

for review. For the following reasons, we will appoint counsel to represent Murrell and

hold an evidentiary hearing concerning three of Murrell's § 2254 claims.

*I.*       *Background[2]*

In the early morning hours of December 24, 2005, Ashton Chilcoat

("Chilcoat") was working as a volunteer firefighter for the Hereford Volunteer Fire

---

[1] Neither the Attorney General of Pennsylvania nor the Dauphin County District Attorney is the
proper respondent in this action; instead, the proper (and only) respondent is Nancy Giroux, the
superintendent at SCI Albion, who has custody over Murrell. See, e.g., Alleyne v. Rozum, No.
4:07-CV-871, 2007 WL 1520093, at *1 (M.D. Pa. May 21, 2007).

[2] The following background information is taken from the trial testimony in this case, and largely
mirrors the facts provided by the trial court, which were adopted by the Pennsylvania Superior
Court. (See Doc. 15-1 at 16-22 (PCRA court opinion adopting trial court opinion facts); Doc. 48-17
at 1-5 (Superior Court opinion on PCRA appeal, adopting facts from direct appeal opinion, which
facts were adopted from the trial court opinion)). No information in this section is meant to
contradict any finding of fact made by the trial court or the PCRA court. Rather, any additional
information provided beyond the state courts' findings of fact is meant only to supplement those
facts where necessary for the instant habeas claims. If any state-court finding of fact is called into
question, it will be explicitly noted and the appropriate standard of review will be applied.

Company. (Doc. 48-4 at 95). Around 1:30 a.m., Chilcoat was asked to respond to the scene of a reported brush fire off the right-hand shoulder of Interstate 83 South in Baltimore County, Maryland. (Doc. 48-4 at 95-98). When Chilcoat arrived, he saw what initially appeared to be a tree stump that was on fire; however, when he approached the burning object, he discovered that it was a human body. (Doc. 48-4 at 96, 99). In response, Chilcoat contacted the fire department, and shortly thereafter the police were notified. (Doc. 48-4 at 99-100). Eventually, the fire was extinguished and police took over the scene to process evidence. (Doc. 48-4 at 100).

A. The Commonwealth's Law Enforcement and Expert Witnesses

Doctor Zabiullah Ali ("Dr. Ali"), Assistant Medical Examiner for the State of Maryland, conducted the autopsy on December 24, 2005. (Doc. 48-6 at 94-95, 98). Dr. Ali testified that the body had been severely burned and charred, in addition to having been shot four times by a handgun. (Doc. 48-6 at 98-99; Doc. 48-7 at 17). With respect to the gunshot wounds, Dr. Ali observed one on the right side of the victim's head, one on the right side of his face, one on the right side of his neck, and one to the backside of his left hand. (Doc. 48-6 at 98-99; Doc. 48-7 at 8-10). Dr. Ali classified the gunshot wounds to the head as "rapidly fatal," meaning that death would have occurred "within minutes." (Doc. 48-6 at 100). He further concluded that the victim was already dead when the body was set on fire, due to the lack of soot in the airways and a normal carbon monoxide level. (Doc. 48-7 at 1-2).

Kathi Michael ("Michael"), a Forensic Technician for the Baltimore County Crime Lab, was responsible for responding to crime scenes in order to document, collect, preserve, and package pertinent evidence for further analysis. (Doc. 48-5 at 4-5). On

December 24, 2005, Michael was called to the scene—in Upper Cockeysville, Maryland—where Chilcoat found the body. (Doc. 48-5 at 5-6).

Before the body was removed from the scene, Michael collected a lighter, an empty soda can, an automobile fuse, an empty cardboard box, a French fry container, and charred evidence "such as plastic and other debris." (Doc. 48-5 at 7-8, 11-13, 17-20). After the body was removed, additional debris was discovered. (Doc. 48-5 at 22). Specifically, Michael discovered remnants of dry wall or other trash that can be found at a construction site, as well as charred plastic. (Doc. 48-5 at 22). Regarding the plastic material, Michael observed black plastic that was severely charred and melted together, and a clear plastic that was "more intact." (Doc. 48-5 at 22).

Detective Brian Edwards ("Detective Edwards"), a homicide detective for the Baltimore County Police Department, also responded to the scene where the body was discovered. (Doc. 48-5 at 64-66). Similar to Michael, Detective Edwards observed plastic material beneath the body. (Doc. 48-5 at 68, 69). Once the body was removed from the scene,

> there were portions of what looked like black plastic underneath of his body. . . . [T]here was also some rubble or debris that was foreign to the area. Again, he was laying on the concrete culvert. . . . The area around him was grass. There was no bare soil. Everything was frozen solid, but underneath of his body was, it looked like, some soil and rubble, debris, various different things, but they weren't frozen. They were in between his body and that black plastic. We [also] saw what looked like drywall screws and some various other, couldn't tell whether it was dirt, soil, construction debris or what it was.

(Doc. 48-5 at 69).

Four days after the discovery of the body, on December 28, 2005, Detective Edwards and his partner, detective Ken Lang ("Detective Lang"), traveled to Harrisburg,

Pennsylvania to meet with Keisha Walker ("Walker"), who had called the police earlier that day about the unidentified body after seeing a sketch of the victim police had released to the media. (Doc. 48-5 at 72, 83). Walker had suggested that the unidentified victim was Wesley Person ("Person"), which the detectives then confirmed through fingerprint analysis. (See Doc. 48-5 at 72, 83).

Present at that December 28th meeting, which took place at 340 Swatara Street in Steelton, Pennsylvania, were Walker—"Person's current girlfriend," and Person's friends Steven Aikens ("Aikens"), Alex Cantave ("Cantave"), Abdul McCauley ("McCauley"),[3] and Justin Glover ("Glover"). (Doc. 48-5 at 72). Apparently, Aikens, Cantave, McCauley, and Glover showed up voluntarily at the meeting shortly after the officers had arrived—they had not been contacted or summoned by the detectives. (Doc. 48-5 at 85). Person and Walker had lived together at this residence before Person's death. (Doc. 48-5 at 82, Doc. 48-6 at 46, Doc. 48-11 at 67-68). Each individual present was interviewed separately. (Doc. 48-5 at 85, 86, 87, 88). The detectives also provided official notification of Person's death at this time. (Doc. 48-5 at 72).

Detective Edwards spoke with Glover first, who was crying and upset after being informed about Person's death. (Doc. 48-5 at 86-88). Detective Edwards next spoke with McCauley. During their conversation, McCauley told him about the events that had transpired the last time he saw Person alive. (Doc. 48-5 at 73). McCauley also informed Detective Edwards of a potential bank fraud scam, see Section II. B., infra, in which McCauley had heard Person was involved. (Doc. 48-5 at 73). In that vein,

_____

[3] McCauley's nickname is "Koppo." (See Doc. 48-5 at 84; Doc. 48-6 at 7; Doc. 48-10 at 25). This nickname appears in some of the police investigation reports and trial testimony.

McCauley provided Detective Edwards with the name "Karyn,"[4] an alleged member of the fraud scheme, and explained that Glover knew more information. (Doc. 48-5 at 74).

Believing Glover had more information, McCauley went upstairs to talk with him; however, Glover allegedly became upset when he learned that McCauley had told Detective Edwards about the scheme. (Doc. 48-5 at 75, 92). McCauley testified that Glover told him not to tell the detectives anything. (Doc. 48-3 at 82). Once Detective Edwards and McCauley resumed their conversation, Glover left Person's residence. (Doc. 48-3 at 83). According to Aikens, Glover had appeared nervous that day. (Doc. 48-10 at 44-45).

Thereafter, during the ongoing investigation, Detective Edwards learned that Glover was involved with Murrell—Glover's cousin—in purchasing investment properties to renovate and resell or rent. (Doc. 48-5 at 76). One of those properties was 441 South 13th Street, in Harrisburg, Pennsylvania. (Doc. 48-5 at 75, 76). Tax records for the property listed Murrell as the owner. (Doc. 48-5 at 76). A deed showed that Murrell took possession of the property on July 27, 2005. (Doc. 48-5 at 78-79).

During the investigation, Detective Edwards went to observe 441 South 13th Street, and saw a real estate sale sign in the yard and noted that the residence appeared vacant. (Doc. 48-5 at 76, 94, 96). Although he was interested in other residences that Murrell owned, he decided it would be prudent to obtain a search warrant since the house appeared to be on the market. (Doc. 48-5 at 77). The police had initially secured a search warrant for this property in early January 2006, but that warrant expired before a search was conducted. (Doc. 48-6 at 12-14). On February 17, 2006, a second search

---

[4] Detective Edwards testified that McCauley later contacted him and informed him that Karyn's last name was "Jackson." (Doc. 48-5 at 74).

warrant was requested and secured for the 441 South 13th Street property, and the property was searched that same day.  (Doc. 48-6 at 12).

When police[5] executed the search warrant on the 441 South 13th Street property, the following items were recovered: (1) a piece of black plastic from under the "outside cellar way;" (2) a piece of clear plastic from the south basement wall; (3) a piece of insulation from the basement floor along the south wall; (4) debris from the basement floor along the south wall; (5) a free-standing piece of ductwork from the basement floor; and (6) a debris sample from the north basement wall.  (Doc. 48-6 at 15-16).  The piece of ductwork that was collected from the floor appeared new compared to the other basement ductwork.  (Doc. 48-6 at 40).

According to Detective Lang, the entire basement, including the floor and walls, appeared to have been recently painted.  (Doc. 48-6 at 17).  The police applied luminol "from top to bottom" throughout the house, including the basement, in hopes of finding the possible presence of blood.  (Doc. 48-6 at 20, 41-42).  When luminol was applied to the piece of ductwork and the appropriate light source was engaged, the ductwork "flashed up with a positive reaction," indicating the possible presence of blood. (Doc. 48-6 at 20, 27).

Glover's residence (1424 State Street) was also searched.  (Doc. 48-11 at 57).  Murrell resided with Glover at the time.  (Doc. 48-11 at 57; Doc. 48-7 at 55).  At this residence, police were searching for handguns, ammunition, blood, accelerants, and other physical evidence.  (Doc. 48-11 at 57).  Prior to executing the search warrant there, police had determined that Glover and Murrell each had a license to possess firearms.  (Doc. 48-

---

[5] The Baltimore County detectives enlisted the help of the Dauphin County police in the investigation due to jurisdictional issues.  (See Doc. 48-6 at 15, 39-40).

11 at 57-58).  Between the two defendants, four firearms had been registered.  (Doc. 48-11 at 58).  During the search of Glover's residence, however, police only found a single Hi-Point .40 caliber handgun in Glover's bedroom.  (Doc. 48-11 at 58-59).  That handgun was not connected to Person's murder and no other firearms were discovered.  (See Doc. 48-11 at 59, 66, 76).

Detective Lang also took multiple investigative steps to locate Glover's green Chevrolet Tahoe.  (Doc. 48-11 at 59-61).  Despite those efforts, police were unable to find the vehicle.  (Doc. 48-11 at 59-61).

The ductwork and other items that had been collected from 441 South 13th Street were tested by Baltimore County forensic biologist Laura Pawlowski ("Pawlowski").  (Doc. 48-7 at 19, 21-22).  Through chemical testing using phenolphthalein, Pawlowski determined that there was blood on the ductwork, and took a sample of that blood for DNA testing.  (Doc. 48-7 at 22-23).  No other items taken from 441 South 13th Street tested positive for blood.  (Doc. 48-6 at 40-41).  Pawlowski also examined the lighter found near Person's burned body, and collected a sample from the lighter wheel to be tested for DNA as well.  (Doc. 48-7 at 23).

The biologic samples collected by Pawlowski and a sample of Person's blood from the autopsy were sent to Bode Technology.  (Doc. 48-7 at 23-25).  Cheek cells from a buccal swab performed on Glover were also provided for comparison purposes.  (Doc. 48-7 at 27).  No similar swab was performed on, or submitted for, Murrell.  (Doc. 48-7 at 27).

At Bode Technology, Julie Kowalewski ("Kowalewski"), a DNA analyst, tested the evidence specifically for DNA.  (Doc. 48-7 at 30, 33-34).  Kowalewksi also

compared the DNA results from the various pieces of evidence to see if there were any matches to Glover's or Person's DNA. (Doc. 48-7 at 34-35). The DNA profile from the ductwork blood matched the DNA profile of Person, and Kowalewski concluded with scientific certainty that Person was source of the blood found on the ductwork. (Doc. 48-7 at 36, 37).

None of the DNA samples matched Glover's DNA profile. (Doc. 48-7 at 45-48). Kowalewski was never provided with a sample from Murrell for DNA analysis. (Doc. 48-7 at 49). The swab from the lighter wheel provided only a "limited profile," and therefore Kowalewski "couldn't draw any conclusive conclusions" from it and was not able to compare it to the other DNA profiles. (Doc. 48-7 at 47).

Cassandra Burke ("Burke"), a forensic chemist with the Baltimore County Police Department, specialized in analyzing trace evidence collected from crime scenes. (Doc. 48-6 at 53-54). Burke was tasked with comparing the physical evidence collected from where Person's body was discovered to that taken from other properties in the Harrisburg area searched by police—specifically, Person's residence (340 Swatara Street), Glover and Murrell's residence (1424 State Street), and Murrell's investment property (441 South 13th Street). (Doc. 48-6 at 45-46, 58-60, 82-83, 86).

Burke analyzed a number of trace materials, including painted drywall, plaster, and plastic. Pieces of drywall (with pink and green paint on them) from the crime scene and from 441 South 13th Street were compared, and the paint samples were found to be consistent visually, microscopically, chemically, and elementally. (Doc. 48-6 at 61). "Consistent" meant not that the paint was a "match" that could only come from one can of paint to the exclusion of all others, but that it originated from a common source or large

"batch" of paint that could be sold by a manufacturer to different stores and, subsequently, different end-purchasers. (Doc. 48-6 at 61-63, 68-69, 74-78). Burke further determined that some of the drywall from the crime scene had a "multilayer" sequence of pink and green paint colors similar to drywall found at 441 South 13th Street. (Doc. 48-6 at 72-73).

Burke also analyzed and compared "animal hair" plaster[6] taken from the crime scene and two of the Harrisburg properties. (Doc. 48-6 at 71). She found that the samples from the crime scene were consistent microscopically, chemically, and elementally with the samples from 441 South 13th Street, and consistent microscopically and chemically with the samples from 340 Swatara Street. (Doc. 48-6 at 71). The samples from the crime scene varied elementally from the 340 Swatara Street samples, but Burke explained that "because of the way this [plaster] was manufactured in small batches on site, those variations could very well occur." (Doc. 48-6 at 71-72). In short, Burke could not conclude with any degree of scientific certainty that the animal hair plaster found at the crime scene came from 441 South 13th Street or 340 Swatara Street. (Doc. 48-6 at 72).

Finally, Burke analyzed plastic materials taken from the crime scene and from 340 Swatara Street and 441 South 13th Street. (Doc. 48-6 at 69-70). Based upon a visual inspection, Burke eliminated the black plastic material from 441 South 13th Street as being consistent with the black plastic material from the crime scene. (Doc. 48-6 at 87-

---

[6] As Burke explained, "[a]nimal hair plaster is a plaster that was used up until and through the early 1930s and '40s for construction purposes at that time, and up until that era . . . the walls of houses were built with a lath[ and] plaster style wall. The plaster was made on site by construction workers in small bucket batches, and they threw animal hairs, typically horse, pig or cow, into that mix as a reinforcer, and then layered that plaster between the lath[] or slats of wood in the walls." (Doc. 48-6 at 70-71). Animal hair plaster was eventually phased out after the advent of drywall and two-by-four construction. (Doc. 48-6 at 71).

88).  Likewise, the clear plastic samples from all three sites were visually dissimilar.  (Doc. 48-6 at 88).

### B.  The Bank Fraud Scheme

At trial, part of the state's theory of the case was that Person, Glover, and Murrell, among others, had been involved in a bank loan fraud scheme.  According to the prosecution, the defendants' alleged motive for murdering Person was that he had recently received a large amount of cash from one of the fraudulent transactions and did not share it with the others.  (See, e.g., Doc. 48-12 at 87-89 (prosecution arguing during closing that bank fraud scheme was motive for murder)).  Considerable time was spent during the five-day trial putting on evidence to establish the loan scheme, as this was the prosecution's sole theory of motive for the killing.  (See Doc. 48-3 at 14-27 (testimony of Linda Witmer), 30-57 (initial testimony of Susan Krause ("Krause"), investigator for Pennsylvania State Employees Credit Union or "PSECU"); Doc. 48-8 at 96-125 & Doc. 48-9 at 1-68 (testimony of Karyn Jackson); Doc. 48-9 at 69-100 & Doc. 48-10 at 1-22 (testimony of Krause, recalled)).

According to Krause, the scheme worked as follows: a person would apply for an automobile loan from PSECU, listing a particular vehicle that was purportedly going to be purchased through a private sale with the loan money.  (See Doc. 48-3 at 41; Doc. 48-9 at 88).  The applicant would also provide a copy of the vehicle's registration card or title, so that PSECU could verify the vehicle's existence and value.  (Doc. 48-3 at 45-46, 49).  That vehicle, however, was never actually bought from the rightful owner with the loan proceeds, and when the applicant would default on the loan after receiving the

money, PSECU would be left with a defaulted loan and no collateral to pursue to mitigate its losses. (Doc. 48-3 at 41; Doc. 48-9 at 88-89).

Krause testified that PSECU had identified 17 loans that were potentially part of the scheme, based on the PSECU membership applications. (Doc. 48-9 at 86). In order to become a PSECU member, which was required before a loan could be obtained, a membership application had to be completed and approved. (Doc. 48-3 at 33; Doc. 48-10 at 9). The membership application contained a section ("referral" field) where an applicant had to identify a close familial relationship—like father, daughter, brother, etc.—to a PSECU member (or eligible member), or identify some other type of acceptable membership basis like being a student or employee at a public Pennsylvania college or university. (Doc. 48-3 at 33-34; Doc. 48-9 at 74-75). The information in the eligibility referral field was not verified by PSECU; rather, it was accepted at face value. (Doc. 48-9 at 92, 98; Doc. 48-3 at 48). No notification was given to members (or eligible members) if someone applied for PSECU membership and listed them as a familial reference. (Doc. 48-10 at 2-3).

By comparing the referral-field names on the membership applications, Krause identified a group of "related" people who were potentially implicated in the fraud scheme. (Doc. 48-9 at 86, 96). For example, Glover became a PSECU member in December 2002 listing on his membership application that he was an eligible community college student; Christine Hughes became a member in January 2003 and listed Glover as her familial reference; Tony Grooms because a member in March 2005 and listed Hughes as his "sister" in the referral field; Person became a member and listed Grooms as his familial reference; and so forth. (See Doc. 48-9 at 78-84).

Murrell became a PSECU member in August 2003, listing Glover as his "brother" in the referral section. (Doc. 48-9 at 80, 83). Six people were "associated" with Murrell, in that they either directly listed Murrell as their membership reference or were referred by someone who had provided Murrell as a reference. (Doc. 48-9 at 80-81). These people were Travis Morgan, Derek Novell, Nicholas Hailey, Rodney Person, Terrell Stubbs, and Karlshen Marks. (Doc. 48-9 at 80-81).

According to Krause, of the 17 loans identified in the group under suspicion, 14 defaulted, and of those 14 defaulted loans only 2 actual vehicles appeared to have been purchased. (Doc. 48-9 at 86). This scheme cost PSECU approximately $115,000. (Doc. 48-9 at 86-87). It does not appear that state or federal charges were brought in relation to the loan scheme.

Krause testified extensively regarding the fraudulent loan obtained by Karyn Jackson, (Doc. 48-3 at 34-42, 46-56; Doc. 48-9 at 69-78, 98-100; Doc. 48-10 at 1-2, 7-12), as well as several fraudulent transactions directly involving Glover, (see Doc. 48-9 at 87-89). Karyn Jackson also testified at trial, explaining her involvement in obtaining a $20,000 loan from PSECU for a vehicle that was never purchased, and giving the proceeds to Person. (Doc. 48-8 at 96-125 & Doc. 48-9 at 1-68).

Jackson consistently testified that she dealt almost exclusively with Person, and gave all of the money—minus $600 that she was allowed to keep for herself—directly to him. (Doc. 48-8 at 103, 105-06, 119; Doc. 48-9 at 7, 9, 11-13, 26, 33, 55). Her involvement with Glover was limited to him being in the car with Person when she was taken to PSECU to file her membership application, which was already partially completed by either Glover or Person. (Doc. 48-8 at 99-101, 124; Doc. 48-9 at 25-26). Glover was

not present during any of Jackson's deposit, withdrawal, or check-cashing transactions. (Doc. 48-8 at 114, 115; Doc. 48-9 at 15-16).

Two checks from PSECU totaling $20,000 were cut on December 8, 2005. (Doc. 48-8 at 121; Doc. 48-9 at 2, 3, 21). Jackson immediately cashed the first $5,000 PSECU check (made out solely to Jackson) with Person that same day at a check-cashing establishment, and gave the majority of that cash to him. (Doc. 48-8 at 110-11; Doc. 48-9 at 4-7, 21). After this check was cashed, Jackson deposited the second PSECU check for $15,000 made out to Jackson and Ira Weinstock (the record vehicle owner), into her account at Belco Credit Union. (Doc. 48-8 at 112; Doc. 48-9 at 3-4, 8, 21, 71-72). Both Weinstock's and Jackson's signatures on this check appear to have been forged. (Doc. 48-3 at 22; Doc. 48-8 at 111-12; Doc. 48-9 at 3-4, 73).

Due to institutional withdrawal limits, Jackson first withdrew $9,000 of the $15,000 loan proceeds held in her Belco account around December 12 or 13, 2005, and gave the money to Person, who was with her at the time of the withdrawal. (Doc. 48-8 at 105, 112-13, Doc. 48-9 at 9, 32, 65). Finally, within a few days of Christmas (on either December 22 or 23, 2005), she withdrew the remaining $6,000 from Belco with Person present and gave all of the cash to him. (Doc. 48-8 at 114; 48-9 at 11-12, 67). Jackson testified that she last saw Person on the morning of December 23, 2005, around the time she gave him the last of the loan proceeds. (Doc. 48-9 at 11-12).

Jackson further testified that she did not know Murrell. (Doc. 48-9 at 52-53). Nor was Jackson connected to Murrell through the PSECU membership application referral fields. (See Doc. 48-9 at 74-76, 78).

When questioned by Murrell's trial counsel about Murrell's possible involvement in the scheme, Krause primarily connected Murrell through PSECU loans obtained by Nicholas Hailey ("Hailey").[7]  (Doc. 48-10 at 4-7, 13-16).  Murrell had personally obtained vehicle and mortgage loans from PSECU, but those loans were either paid off or in good standing, save the mortgage on one of his investment properties (1525 Berryhill Street, Harrisburg), which was in arrears, possibly due to his arrest in the instant matter.  (See Doc. 48-10 at 3-4, 5-7).

Hailey had obtained two loans from PSECU—one for a motorcycle he bought from Murrell, and one for a different motorcycle purchase involving a "David Aulman."  (Doc. 48-10 at 16, 20).  Like the other transactions at issue, PSECU cut two checks for each loan: one for the purchase price of the motorcycle made out to the seller and the buyer, and one for the remaining equity in the motorcycle made out to the buyer (the borrower) only.  (Doc. 48-10 at 19-20).

Krause characterized Hailey's loan transactions as fraudulent based on their default and the fact that three of the four PSECU loan checks were deposited into Murrell's bank account at a different credit union.  (Doc. 48-10 at 4, 16, 20).  She testified that both checks for the first loan (for Murrell's motorcycle) were deposited into Murrell's account.  (Doc. 48-10 at 16).  For the second loan, the purchase-price check made out to Aulman and Hailey was deposited into Aulman's account, and the equity check made out to Hailey was deposited into Murrell's account.  (Doc. 48-10 at 19-20).  Krause did not know whether there had been an attempt to repossess either motorcycle after Hailey

_____

[7] Krause also briefly mentioned that "a forged check payable to Rodney Person and the [vehicle] seller was deposited to Murrell's account at Members First Credit Union," (Doc. 48-10 at 4), but there was no further testimony or explanation regarding this transaction.

defaulted on the loans, or whether there had been an actual motorcycle sold in the second loan transaction involving Aulman and Hailey.  (Doc. 48-10 at 17-18, 21-22).

C.  The Cell Phone Records

The Commonwealth also spent considerable time, through the testimony of Detective Lang and two expert witnesses, tracking the defendants' cell phone activity and locations on the night of Person's murder.  A critical part of the state's circumstantial evidence involved the cell phone linked to Glover[8] and its recorded activity on December 23 and 24, 2005.

As one expert explained, the average distance from a cell-phone caller to a connecting cell tower was one-half mile to two miles, but could be longer or shorter depending on the surroundings, obstructions, and height of the tower.  (Doc. 48-5 at 54).  Although the exact location of the cell phone could not be pinpointed, the "bottom line" was that the cell phone was in the "general area" of the tower to which it was connected.  (Doc. 48-5 at 52-53, 55).

According to the experts, Glover's cell phone was recorded as using a cell tower located in Harrisburg, Pennsylvania at 8:35 p.m. on December 23rd.  (Doc. 48-5 at 42).  It was then recorded as using two cell towers in York, Pennsylvania starting at 11:28 p.m. that night, the first tower being situated north of the second tower.  (Doc. 48-5 at 45).  Twenty minutes later, at 11:48 p.m., Glover's cell was recorded as connecting to a cell tower in Parkton, Maryland, which is south of York following the general direction of Interstate 83.  (Doc. 48-2 at 68).  At 12:14 a.m. on December 24th, Glover's cell connected to a tower in Ruxton, Maryland, and then a tower in Baltimore, Maryland less

_____

[8] This cell phone number was 717-421-0786.  (Doc. 48-2 at 77; Doc. 48-7 at 52).  The actual subscriber of the cell phone was Karen Gadsden—Glover's mother, (Doc. 48-7 at 53-54), but the phone was known to be Glover's, (see, e.g., Doc. 48-7 at 52, 58; Doc. 48-10 at 47).

than a minute later. (Doc. 48-2 at 68). Finally, at 2:06 a.m. on December 24th, Glover's cell phone was recorded as using towers in Towson, Maryland. (Doc. 48-2 at 79).

Mapping out the experts' testimony regarding Glover's cell phone's connection to towers on December 23rd and 24th provided a path that began in Harrisburg and traveled south along Interstate 83, ending in the Baltimore area. This path correlated with the location and timing of the discovery of Person's body. That is, the cell phone moved south from Harrisburg along Interstate 83 into Maryland on the night in question during approximately the same time period as it was alleged that Person was killed and his body left in Maryland off Interstate 83.

Detective Lang also merged the December 2005 cell phone records for Glover's and Murrell's cell numbers. The point of this exercise was to see if the calls made by these cell phones were accessing the same cell towers at the same time, and if so, if the phones were using the same sectors of the towers, which could further pinpoint a similar geographic location. (Doc. 48-7 at 55-57).

The records showed that on the afternoon of December 23rd, Murrell's phone contacted Glover's phone several times from different locations, first in York and then in Harrisburg. (Doc. 48-7 at 60-64). At 3:28 p.m., the phones contacted each other using the same cell tower in Harrisburg. (Doc. 48-7 at 64-65). The phones did not connect again until 11:43 a.m. on December 24th. (Doc. 48-7 at 65). However, other calls made by these cell phones to different numbers on December 23rd at approximately 4:00 p.m., 4:10 p.m., 5:00 p.m., and 8:50 p.m. used the same cell towers located around Harrisburg, indicating the same general location of the cell phones at roughly the same times. (See Doc. 48-7 at 68-73). The four calls during this period did not always connect

16

using the same sector of the cell tower, however, indicating that the cell phone calls were originating from a different direction within the general 360-degree coverage area of the cell tower.  (Doc. 48-8 at 18-19, 42).  The last call from Murrell's cell phone on December 23rd was recorded at 8:58 p.m. using a cell tower in Harrisburg, and the phone did not make another call until 4:00 a.m. the following morning.  (Doc. 48-7 at 73).

### D.  The Events of December 23 and 24, 2005

Abdul McCauley was a key witness for the Commonwealth.  He testified that he was Person's "best friend for 14 years," and was best friends with Glover since 1987.  (Doc. 48-3 at 58-59).  McCauley provided multiple oral and written statements to the police, and also testified at the preliminary hearing that took place on November 8, 2006.  (Doc. 48-4 at 29-31).

McCauley was with Person on December 23, 2005, the last day Person was seen alive.  That day, McCauley drove Person and Aikens to Sneaker Villa in downtown Harrisburg and dropped them off around 2:45 in the afternoon.  (Doc. 48-4 at 5; Doc. 48-10 at 26).  McCauley then left to pick up his girlfriend to take her to the Harrisburg East Mall to pick up her paycheck.  (Doc. 48-4 at 5).  Person was the only one shopping that day, and bought two pairs of sneakers, two coats, and a hat.  (Doc. 48-10 at 26, 27, 59).

After shopping, Person became impatient and wanted to be picked up, so Aikens called Glover for a ride.  (Doc. 48-10 at 28).  Glover asked what they were doing, and after being told that they were shopping, Glover told Aikens that he was unable to pick them up.  (Doc. 48-10 at 28).  Aikens next called McCauley and explained that Glover could not get them, so McCauley agreed to return and pick them up.  (Doc. 48-10 at 28; Doc. 48-4 at 7).  Within a few minutes, McCauley arrived at a parking lot across the street

from Sneaker Villa, called Aikens and Person to tell them he was ready to pick them up, the two walked to where McCauley was parked, and Person put his shopping bags in McCauley's trunk.  (Doc. 48-3 at 66; Doc. 48-10 at 29).

Shortly before Aikens and Person had walked over to McCauley's waiting car, Glover and Murrell arrived in Murrell's car, and asked where Person was.  (Doc. 48-3 at 65; Doc. 48-10 at 29-30; Doc. 48-4 at 8-9).  McCauley told them he was meeting Person and Aikens at any moment.  (Doc. 48-3 at 65).

Eventually all five people were gathered in the parking lot.  Murrell spoke with McCauley briefly about rental properties, and Glover spoke with Person for several minutes near the rear of McCauley's car out of earshot of the others.  (Doc. 48-10 at 31, 34; Doc. 48-3 at 66, 67).  McCauley told Murrell that he had a cousin interested in real estate, but Murrell told McCauley not to call that evening because "he was going to be busy."  (Doc. 48-3 at 67).  Aikens had tried to talk with Murrell, but Murrell had given him an "evil look" and had instead spoken with McCauley.  (Doc. 48-10 at 30-31).

After several minutes, Person announced that he would be riding back to his home in Steelton with Murrell and Glover instead of McCauley, and retrieved his bags from McCauley's trunk and put them in Murrell's car.  (Doc. 48-10 at 31, 34; Doc. 48-3 at 68).  Aikens asked Person for $20 to purchase cell-phone minutes, and Person pulled out a "wad" of $50 and $100 bills that was two to three inches thick and gave Aikens a $50 bill.  (Doc. 48-10 at 31-32).  Person then left with Murrell and Glover.  (Doc. 48-3 at 68; Doc. 48-10 at 36).  According to McCauley, this informal meeting wrapped up around 3:30 or 4:00 p.m.  (Doc. 48-3 at 69; Doc. 48-4 at 12).  This was the last time McCauley or Aikens saw Person alive.  (Doc. 48-3 at 68; Doc. 48-10 at 36).

Later that afternoon and into the evening, Aikens and McCauley attempted to reach Person by "call[ing] around" and by going to his house, but were unsuccessful. (Doc. 48-4 at 20; Doc. 48-10 at 38). They stopped by his home in Steelton two times that evening, but he was not there. (Doc. 48-4 at 13-15, 19-20; Doc. 48-10 at 36-37). The second time they went to his home, however, his girlfriend Keisha Walker arrived while they were waiting and she let them inside. (Doc. 48-4 at 22-23; Doc. 48-10 at 37). Walker told McCauley and Aikens that she had not seen or heard from Person since that morning. (Doc. 48-4 at 23; Doc. 48-10 at 37). Aikens went upstairs and saw that Person's shopping bags from that afternoon had been dropped off in his bedroom, as if Person "just threw everything down and then headed back out the door." (Doc. 48-10 at 37).

Aikens went out the following evening, December 24, 2005, with McCauley and Cantave, and saw Glover at a bar. (Doc. 48-10 at 41). Aikens testified that Glover had "some white stuff" on his lip, and when asked about it, Glover responded that it was a cold sore. (Doc. 48-10 at 41-42, 95). Aikens thought it looked more like Glover's lip was "split," as if someone had "punched [Glover] in the mouth." (Doc. 48-10 at 42). McCauley similarly testified to seeing "a little scar on [Glover's] lip or his face area" on the night of December 24th, (Doc. 48-3 at 74), that "looked like he had been punched in the face," (Doc. 48-4 at 26-27). After not seeing or hearing from Person for one or two days, Aikens became concerned about him and began to believe that something happened to him. (Doc. 48-10 at 42-43).

II.     Procedural History

Murrell was arrested on October 20, 2006. (Doc. 48-16 at 9). The jury trial for Murrell and Glover in the Court of Common Pleas of Dauphin County, Pennsylvania

began on February 11, 2008, and continued to February 15, 2008. (Doc. 15-1 at 16). Murrell and Glover were found guilty on all charges. (Doc. 15-1 at 16; Doc. 62 at 14). On June 18, 2008, Murrell was sentenced to life imprisonment without parole for first-degree murder, 10-20 years for conspiracy to commit murder, and 1-2 years for abuse of a corpse. (Doc. 15-1 at 16; Doc. 14-3 at 2). The latter two sentences were ordered to run consecutively with each other, but concurrently with the life sentence for Count I. (See Doc. 48-13 at 7). A post-sentence motion seeking judgment of acquittal or a new trial was denied by operation of law on May 21, 2009. (Doc. 15-1 at 17).

On June 1, 2009, Murrell timely filed a notice of appeal with the Common Pleas court, which directed him to file a statement of errors complained of on appeal. (See Doc. 48-14 at 5; Doc. 48-16 at 29); Pa. R. App. P. 1925(b). Murrell complied, and on September 29, 2009, the trial court filed its opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925 ("trial court opinion"). (See Doc. 15-1 at 59-72; see also Doc. 48-14 at 5 (quoting September 29, 2009 trial court opinion)). The Superior Court of Pennsylvania affirmed Murrell's conviction and sentence in a non-precedential opinion on March 25, 2010. Commonwealth v. Murrell, No. 963 MDA 2009 (Pa. Super. Ct. Mar. 25, 2010) (nonprecedential); (Doc. 48-14) [hereinafter "Doc. 48-14"]. Murrell sought further review by the Supreme Court of Pennsylvania, which denied his petition for allowance of appeal on October 13, 2010. Commonwealth v. Murrell, 8 A.3d 898 (Pa. 2010) (table); (Doc. 15-1 at 17).

On January 10, 2012, Murrell timely filed a counseled petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-9546. (See Doc. 48-15). The Commonwealth responded to the petition on July 27, 2012. (Doc.

48-16 at 29).  On September 18, 2012, the PCRA court issued an opinion stating its intention to dismiss Murrell's PCRA petition without a hearing.  (See Doc. 15-1 at 16-33 (PCRA Court opinion)).  On October 8, 2012, Murrell filed a response in opposition to the notice of intent to dismiss, but the PCRA court dismissed the PCRA petition the following day without holding an evidentiary hearing.  (Doc. 48-16 at 6, 10).

Murrell timely filed a notice of appeal with the PCRA court, and on November 20, 2012, provided a Rule 1925(b) statement of matters complained of on appeal.  (Doc. 48-16 at 10, 46).  The PCRA court filed its Rule 1925 opinion on January 7, 2013, which simply adopted the prior September 18, 2012 opinion dismissing the PCRA petition.  (Doc. 48-16 at 10, 46).

Murrell filed his brief in support of his PCRA appeal with the Superior Court of Pennsylvania on February 20, 2013.  (Doc. 48-16 at 1).  In a non-precedential opinion on June 11, 2013, the Superior Court affirmed the PCRA court's dismissal of Murrell's PCRA petition.  Commonwealth v. Murrell, No. 1862 MDA 2012 (Pa. Super. Ct. June 11, 2013) (nonprecedential); (Doc. 48-17) [hereinafter "Doc. 48-17"].  Murrell again sought further review by the Supreme Court of Pennsylvania, which denied allowance of appeal—from the PCRA petition denial—on December 4, 2013.  Commonwealth v. Murrell, 61 A.3d 76 (Pa. 2013) (table); (Doc. 15-1 at 17).

Due to the impending expiration of the one-year federal habeas statute of limitations, prior to the December 4th denial of review by the Pennsylvania Supreme Court, Murrell filed the instant petition under 28 U.S.C. § 2254 on October 2, 2013.  (Doc. 1).  In his petition, he outlined seventeen grounds for habeas relief ("A" through "Q").

(Doc. 1 at 6-7). He also moved to hold his petition in abeyance while he exhausted his state remedies. (Doc. 1 at 4; Doc. 2).

After his petition for allowance of appeal was denied, Murrell moved to amend his habeas petition, filing a 488-page "consolidated" habeas petition and supporting memorandum of law. (Docs. 14, 15). Included with this consolidated petition were over 500 pages of supporting exhibits. (Docs. 15-1, 15-2, 15-3, 15-4, 15-5). Murrell also included a "supplement" to his petition that was prepared by the attorney who represented him on direct appeal and in the PCRA proceedings, Royce L. Morris ("Morris"). (Doc. 14-3). Morris had independently prepared and filed this supplement to protect Murrell's federal habeas statute of limitations. (Doc. 14-3 at 1 n.1); Murrell v. Pa. Attorney Gen., No. 1:13-cv-02935 (M.D. Pa. Dec. 5, 2013). Accordingly, in the supplement, Morris explicitly requested that amendment be permitted. (Doc. 14-3 at 1 n.1).

On December 23, 2013, this court consolidated the two habeas actions into the instant case. (Doc. 18). That same day, Respondents were served with, and ordered to respond to, the amended § 2254 petition (Doc. 14-2), the supplement (Doc. 14-3), and the consolidated petition and exhibits (Doc. 15). (See Doc. 19). Respondents filed a response to Murrell's petition, but only addressed the supplement drafted by Morris, rather than—as directed—the amended petition, the supplement, and Murrell's consolidated petition. (See Doc. 30).

After litigating a series of motions concerning discovery, (see Docs. 36, 37, 40-43, 48, 50, 52, 53, 58, 59), we directed Murrell to clarify his claims for relief, (Doc. 60). Murrell filed a response again listing grounds "A" through "Q," including numerous sub-

claims, for a total of 102 claims for relief.  (Doc. 61).  His amended consolidated habeas petition and list of claims contain both exhausted and unexhausted claims.  Murrell also filed several more exhibits in the following months.  (Doc. 64).

Murrell's § 2254 petition is now ripe for review.  Because of the extensive number of claims presented, the court will address the groups of claims ("A" through "Q"), rather than each claim individually.  If any particular claim is omitted from discussion, such omission is intentional and indicates either repetition, lack of merit, or both.

III.        *Standards of Review*

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011).  Federal courts reviewing habeas corpus petitions "must be vigilant and independent . . . a commitment that entails substantial judicial resources."  Id.  When reviewing, under 28 U.S.C. § 2254, the constitutionality of a state prisoner's conviction and sentence, federal habeas courts "are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A.  Federal Habeas Review of Properly Exhausted Claims

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241–2254, mandates that petitioners demonstrate that they have "exhausted the remedies available in the courts of the State" before seeking federal habeas relief.  28 U.S.C. § 2254(b)(1)(A).  An exhausted claim is one that has been "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process," and which has been adjudicated on the merits.  See Carpenter v. Vaughn, 296

F.3d 138, 146 (3d Cir. 2002) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)); Johnson v. Williams, 568 U.S. 289, 302 (2013).  "Fair presentation" of a claim merely requires the petitioner to "present [the] federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  Greene v. Palakovich, 606 F.3d 85, 93 (3d Cir. 2010) (citation omitted).  For § 2254(d) purposes, a claim has been adjudicated on the merits "when a state court has made a decision that finally resolves the claim on the basis of its substance, rather than on a procedural, or other, ground."  Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 545 (3d Cir. 2014) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009)).

When a claim is properly exhausted in the state courts and then raised on federal habeas review, the level of deference afforded to the state-court decision is substantial.  Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 (3d Cir. 2017), petition for cert. filed sub nom., Gilmore v. Bey, No. 17-681 (U.S. Nov. 8, 2017).  The AEDPA "does not 'permit federal judges to . . . casually second-guess the decisions of their state-court colleagues or defense attorneys.'"  Collins, 742 F.3d at 543 (quoting Burt v. Titlow, 134 S. Ct. 10, 13 (2013)).  Accordingly, under § 2254(d), federal habeas relief is unavailable for exhausted claims unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

This is an intentionally difficult standard to meet.  Richter, 562 U.S. at 102.  Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with" clearly established Supreme Court precedent.  <u>Id.</u>  Therefore, to obtain federal habeas relief on an exhausted claim, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  <u>Id.</u> at 103.

Finally, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)[] on the record that was before that state court"; "evidence introduced in federal court has no bearing on § 2254(d)[] review."  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 185 (2011) (footnote omitted). "[D]istrict courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d).  Otherwise, federal habeas petitioners would be able to circumvent the finality of state court judgments by establishing a new factual record."  <u>Brown v. Wenerowicz</u>, 663 F.3d 619, 629 (3d Cir. 2011).  "This would contravene AEDPA, which requires petitioners to diligently present the facts in state court before proceeding to the federal courthouse."  <u>Id.</u>

### B.  <u>Federal Habeas Review of Unexhausted, Defaulted Claims</u>

If a state prisoner has not fairly presented a claim "to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play."  <u>Carpenter</u>, 296 F.3d at 146 (citations omitted).  Generally, if a prisoner has procedurally defaulted on a claim by failing to raise it in state-court proceedings, a federal habeas court will not review the merits of the claim, even one that implicates constitutional concerns.  <u>Martinez</u>, 566 U.S. at 9 (citing <u>Coleman v. Thompson</u>,

501 U.S. 722, 747-48 (1991) and <u>Wainwright v. Sykes</u>, 433 U.S. 72, 84-85 (1977)).  A few limited exceptions to this rule exist.

One exception is that "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law."  <u>Id.</u> at 10 (citing <u>Coleman</u>, 501 U.S. at 750).  "Cause for a procedural default exists where something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule."  <u>Maples v. Thomas</u>, 565 U.S. 266, 280 (2012) (alterations in original) (citations and internal quotation marks omitted).  To establish prejudice, a petitioner must show not merely that there were errors that created a possibility of prejudice, but that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  <u>Holland v. Horn</u>, 519 F.3d 107, 112 (3d Cir. 2008) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)).  If cause and prejudice are established, the federal court reviews the claim "<u>de novo</u> because the state court did not consider the claim on the merits."  <u>Bey</u>, 856 F.3d at 236 (citation omitted).

Another rare exception that will excuse a procedural default is if the petitioner can show that "failure to consider the claim will result in a fundamental 'miscarriage of justice.'"  <u>Carpenter</u>, 296 F.3d at 146 (quoting <u>Coleman</u>, 501 U.S. at 750).  To satisfy the "fundamental miscarriage of justice" exception, a petitioner typically will have to show actual innocence.  <u>Leyva v. Williams</u>, 504 F.3d 357, 366 (3d Cir. 2007) (citation omitted).

C.  <u>Ineffective Assistance of Counsel Claims, Generally</u>

The majority of Murrell's claims assert ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.  It is firmly established that claims of ineffective assistance of counsel are governed by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  The burden is on the defendant to prove such a claim.  <u>Strickland</u>, 466 U.S. at 687.

<u>Strickland</u> sets forth a two-prong test to assess claims of ineffective assistance of counsel.  First, counsel's performance must be deficient.  <u>Jacobs v. Horn</u>, 395 F.3d 92, 102 (3d Cir. 2005) (citing <u>Strickland</u>, 466 U.S. at 687).  "Performance is deficient if counsel's efforts 'fell below an objective standard of reasonableness' under 'prevailing professional norms.'"  <u>Shotts v. Wetzel</u>, 724 F.3d 364, 375 (3d Cir. 2013) (quoting <u>Strickland</u>, 466 U.S. at 688).  However, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Grant v. Lockett</u>, 709 F.3d 224, 234 (3d Cir. 2013) (quoting <u>Strickland</u>, 466 U.S. at 689).

Second, counsel's deficient performance must have prejudiced the defendant.  <u>Jacobs</u>, 395 F.3d at 105 (citing <u>Strickland</u>, 466 U.S. at 692).  "To demonstrate prejudice, 'a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  <u>Shotts</u>, 724 F.3d at 375 (quoting <u>Strickland</u>, 466 U.S. at 694).

D. *Martinez* Exception – Ineffectiveness of Initial-Review Collateral Counsel

In Coleman, the Supreme Court held that ineffectiveness of post-conviction counsel does not qualify as "cause" to excuse procedural default that occurs in those proceedings, as there is "no constitutional right to an attorney in state post-conviction proceedings." Coleman, 501 U.S. at 752. In Martinez, however, the Court provided a narrow exception to this rule. There, the Court held that

> [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding . . . counsel in that proceeding was ineffective.

Martinez, 566 U.S. at 17. Pennsylvania is such a state with a bright-line rule that requires ineffective-assistance-of-counsel claims to be raised on collateral review. See Cox v. Horn, 757 F.3d 113, 124 n.8 (3d Cir. 2014) (citing Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002)). Thus, under Martinez, "counsel's failure to raise an ineffective assistance [of trial counsel] claim on collateral review may excuse a procedural default if: (1) collateral attack counsel's failure itself constituted ineffective assistance of counsel under Strickland, and (2) the underlying ineffective assistance claim is a substantial one." Bey, 856 F.3d at 237-38.

Therefore, in the instant case, ineffectiveness of initial-review PCRA counsel can qualify as "cause" to excuse a procedural default of a claim of ineffective assistance of trial counsel, so long as that defaulted claim is substantial. A "substantial" claim is one that "has some merit." Martinez, 566 U.S. at 14. Notably, the Supreme Court of the United States has explicitly rejected the extension of the Martinez exception

to underlying claims of ineffective assistance of direct-appeal counsel. <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2065 (2017).

### E. "Doubly" Deferential Standard Applied Under 28 U.S.C. § 2254(d) to Exhausted Ineffective-Assistance-of-Counsel Claims

When a claim of ineffective assistance of counsel has been exhausted in state court, review of that claim by a federal habeas court is significantly circumscribed. The federal court does not review the <u>Strickland</u> claim <u>de</u> <u>novo</u>; rather, "[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was *unreasonable.*" <u>Richter</u>, 562 U.S. at 101 (emphasis added); <u>Collins</u>, 742 F.3d at 547-48. As such, "so long as fairminded jurists could disagree on the correctness of the state court's decision," a state court's determination that a <u>Strickland</u> claim lacks merit precludes federal habeas relief. <u>Id.</u>

## IV.      *Discussion*

As stated above, Murrell raises 102 claims for relief in his consolidated habeas petition (Doc. 15) and corresponding "claims for relief" (Doc. 61). Those claims are arranged into 17 groups of issues, grounds "A" through "Q." We will address the grounds for relief, rather than the individual claims, in turn.

### A.   Ineffective Assistance – Failure to Call Character Witnesses

Murrell's first ground for relief is one of his strongest. He asserts that his trial counsel—George H. Matangos ("Matangos")—was ineffective for failing to call character witnesses at trial.

Murrell alleges that he has absolutely no criminal history or even a history of an arrest, that he was working full time as a janitor for the Harrisburg School District while simultaneously taking college classes, was married, was renovating and renting

investment properties, and was well known for having a good reputation in the community. (Doc. 15 at 80).  He further avers he informed Matangos of the existence of multiple character witnesses and requested they be called to testify, that Matangos also had actual knowledge of some of these witnesses from the police interviews contained in the discovery materials, that the witnesses were willing and able to testify at trial, and that they would have testified that he had a reputation for good moral character and non-violence. (Doc. 15 at 79-81).

This claim was fully exhausted, as it was presented in his initial PCRA petition and then on PCRA appeal to the Superior Court, and relief was denied by the state courts.  The PCRA court took issue with the claim for two reasons.  First, it found that Murrell had failed to adequately plead the claim in his PCRA petition.  (Doc. 15-1 at 31).  Citing to Pennsylvania case law, the PCRA court found Murrell's claim deficient because his petition and accompanying witness affidavits had failed to explicitly assert that Matangos had been informed of the identity of the proffered character witnesses, including the two named witnesses who provided affidavits—Robert McMurray and Nate Spriggs.  (Doc. 15-1 at 31).

After noting the "facial deficiencies," it nevertheless considered the merits of the claim, and found that Matangos had acted reasonably by refraining from calling character witnesses.  (Doc. 15-1 at 31-32).  The PCRA court reasoned that the state could have cross-examined the character witnesses with "extensive testimony of [Murrell's] involvement in the fraudulent loan scheme" that had been presented "in the instant case." (Doc. 15-1 at 32).  Finally, it found that no prejudice resulted because "substantial compelling physical evidence existed of [Murrell's] participation in the murder and abuse of

corpse [sic], such that the lack of testimony of the . . . character witnesses had no effect on the outcome of the proceedings."  (Doc. 15-1 at 32).

The Superior Court affirmed, basing its decision on Murrell's failure to address the PCRA court's determination of the pleading deficiencies.  (Doc. 48-17 at 13-14).  Explaining that on appeal Murrell did not "answer the [PCRA] court's finding that [his] PCRA petition did not allege trial counsel knew of th[e] witnesses," Murrell therefore "ha[d] not demonstrated the PCRA court erred when finding he had not alleged sufficient facts to necessitate a PCRA hearing."  (Doc. 48-17 at 14).  The Superior Court ultimately held that Murrell provided "no cause to disturb the PCRA court's" decision, and did not independently review or discuss the merits of the claim.  (Doc. 48-17 at 14).  As noted above, the Supreme Court of Pennsylvania denied review.

Because this Strickland claim has been fully exhausted, we will apply the "doubly" deferential standard of review, see Section III. E., supra.  Thus, we ask whether the state court's application of the Strickland standard was reasonable by determining whether there is "any reasonable argument that trial counsel satisfied Strickland's deferential standard."  Richter, 562 U.S. at 101, 105.  For the following reasons, this court agrees with Murrell that there is no reasonable argument on record that trial counsel satisfied Strickland's standard.

Because the Superior Court affirmed on the basis that Murrell did not demonstrate error in the PCRA court's decision, we will focus on the PCRA opinion as it represents the "last reasoned decision" of the state courts.  See Simmons v. Beard, 590 F.3d 223, 231-32 (3d Cir. 2009).  Here, like the Third Circuit in Bond v. Beard, "we conclude that we should review the PCRA decision since it either represents the state

courts' last reasoned opinion on this topic or *has not been supplemented in a meaningful way by the higher state court*." 539 F.3d 256, 289-90 (3d Cir. 2008) (emphasis added); see also Blystone v. Horn, 664 F.3d 397, 417 n.15 (3d Cir. 2011) ("Where a lower state court opinion represents the state court's last reasoned opinion on [the relevant issue], we look through the higher state court opinion and apply § 2254(d)'s standards to the highest reasoned opinion." (alteration in original) (citation and internal quotation marks omitted)).

The PCRA court first found a pleading deficiency with Murrell's PCRA petition. In support, it relied on a nearly three-decades-old Superior Court decision, Commonwealth v. Torres, 477 A.2d 1350 (Pa. Super. Ct. 1984). Torres held that when asserting an ineffectiveness claim based on a failure to call witnesses, a defendant must "supply a factual basis indicating (1) the identity of the witnesses; (2) that counsel knew of the existence of the witnesses[9]; (3) the material evidence that the witnesses would have provided; and (4) the manner in which the witnesses would have been helpful to his cause." 477 A.2d at 1355.

The PCRA court found that Murrell had failed the second prong by not explicitly pleading that Matangos knew the identity of McMurray and Spriggs. But this conclusion ignores the plain language of Murrell's PCRA petition, which expressly alleged that Matangos "was *also apprised* of *additional* character witnesses" beyond McMurray and Spriggs. (Doc. 48-15 at 13) (emphasis added). As Murrell correctly points out, if Matangos was "also apprised of additional character witnesses," that can only mean that

---

[9] It bears noting that much more recent Pennsylvania Supreme Court precedent, to which the PCRA court was bound at the time it issued its opinion, provides that the knowledge-of-the-witness prong of this rule is that "counsel knew of, *or should have known of*, the existence of the witness." Commonwealth v. Clark, 961 A.2d 80, 90 (Pa. 2008) (emphasis added).

Matangos was informed of the existence of other potential character witnesses in addition to being informed of McMurray and Spriggs.

In any event, the PCRA court addressed the merits of this <u>Strickland</u> claim, which is the proper focus here. As previously noted, the PCRA court declined to hold an evidentiary hearing.

*1. <u>Strickland</u> Performance Prong Under § 2254(d) Review*

In analyzing the first <u>Strickland</u> prong—deficient performance of counsel— the PCRA court found Matangos acted reasonably by refraining from calling character witnesses. The PCRA court reasoned that the prosecution could have cross-examined the character witnesses with "extensive testimony of [Murrell's] involvement in the fraudulent loan scheme" that had been presented "in the instant case." (Doc. 15-1 at 32). Respondent repeats this line of reasoning in opposition to Murrell's instant § 2254 petition. (Doc. 30 at 18). This rationale is incorrect for at least two reasons.

First, the loan scheme was the subject of extensive testimony throughout the trial because it was the Commonwealth's basis for motive. Murrell's potential implication in the scheme was discussed at length during the testimony of Susan Krause, PSECU's investigator. As such, the jury had already heard all of this testimony, and the fact that it may have resurfaced on cross-examination of a character witness is largely irrelevant. The danger of placing a criminal defendant's character "at issue" by putting on good character witnesses is that prior bad acts—unrelated to the current charges and unknown to the jury—may be exposed on cross-examination of those witnesses, which could prejudice the defendant in the eyes of the jury. <u>See</u> 1 McCormick on Evidence § 191 (Kenneth S. Broun & Robert P. Mosteller, eds., 7th ed. 2014). There is no such risk of

prejudice when the jury has already heard extensive testimony regarding the other alleged bad act.

Second, and more importantly, the reasoning provided by the PCRA court and Respondent directly contravenes well-settled Pennsylvania law.  In Pennsylvania, a criminal defendant may open up character by putting on witnesses to testify to his good character.  PA. R. EVID. 404(a)(2)(A).[10]  The state may rebut that testimony.  Id.

The method by which character evidence is presented and rebutted, however, is governed by Pennsylvania Rule of Evidence 405.  The defendant can prove a pertinent character trait, e.g., good moral character or non-violence, only by putting on testimony about his reputation for such character.  PA. R. EVID. 405(a).  To test the credibility of a character witness, the prosecution can cross-examine that witness regarding "knowledge of particular acts of misconduct by the defendant," Commonwealth v. Fletcher, 861 A.2d 898, 915-16 (Pa. 2004); PA. R. EVID. 405(a)(1), but "inquiry into allegations of other criminal conduct by the defendant, *not resulting in a conviction*, is not permissible," PA. R. EVID. 405(a)(2) (emphasis added); see also Commonwealth v. Morgan, 739 A.2d 1033, 1036 (Pa. 1999) (holding that because use of a criminal defendant's prior arrest was already impermissible on cross-examination of character witnesses, use of defendant's alleged but unproven prior offenses logically was also improper and prejudicial, as "mere allegations of misconduct, like arrests, 'are consistent with either guilt or innocence' and certainly do not carry the conclusive determination of guilt by conviction" (citation omitted)).

---

[10] The current Pennsylvania Rules of Evidence are used here.  However, at the time of trial and the state collateral-review proceedings, the substance of the pertinent rules was the same, and the case law regarding this issue was well established.

It is undisputed that Murrell was not charged or arrested, let alone convicted, for his alleged involvement in the PSECU bank fraud scheme. Accordingly, the use of these allegations on cross-examination of a good-character witness would have been off limits to the prosecution under long-held Pennsylvania law.

But the question is not whether the PCRA court was wrong. It was. Rather, the appropriate inquiry is whether there is any reasonable argument for trial counsel to refrain from calling character witnesses at Murrell's trial.

Neither the PCRA court, the Superior Court, nor Respondent[11] has proffered a reasonable justification for trial counsel's inaction. And, as there was no evidentiary hearing, Matangos has not provided a legitimate strategic reason either. Lastly, this court is unable to conceive of any reason to refrain from calling known character witnesses on behalf of a defendant who has no criminal history, claims he has a reputation in the community for good moral character, and is accused of a vicious murder. Therefore, on the record that was before the state court, "[t]he PCR[A] court's conclusion that trial counsel's decision not to call these witnesses was an exercise of reasonable trial strategy was an unreasonable application of [Strickland]." Branch v. Sweeney, 758 F.3d 226, 235 (3d Cir. 2014).

### 2. *Strickland* Prejudice Prong Under § 2254(d) Review

The second prong of the Strickland analysis asks whether counsel's deficient performance prejudiced the defendant. Under the doubly deferential review required by § 2254(d), the appropriate inquiry here is "whether the state courts unreasonably concluded that there was not a substantial likelihood that [the proffered] testimony would

---

[11] Respondent unhelpfully suggests that "trial counsel clearly had supportive strategic decisions [sic] for not calling these witnesses to the stand." (Doc. 30 at 17). Respondent, however, offers no strategic reason—on the record or theoretical—that would support such a decision.

have changed the outcome of [Murrell]'s trial." <u>Branch</u>, 758 F.3d at 238. This analysis "goes beyond considering the significance of the missing evidence," and requires the consideration of "the record as a whole" in order to "evaluate the weaknesses in the State's case." <u>Id.</u> (citing <u>Grant v. Lockett</u>, 709 F.3d 224, 238 (3d Cir. 2013)). In other words, the "totality of the evidence at trial" must be considered. <u>Grant</u>, 709 F.3d at 238.

Contrary to the PCRA court's one-sentence prejudice-prong determination that "substantial compelling physical evidence existed of [Murrell]'s participation in the murder and abuse of corpse [sic]," this was a close case based entirely on circumstantial evidence. The evidence against Murrell can be summarized as follows.

McCauley and Aikens testified that Person left with Murrell and Glover in Murrell's car sometime in the afternoon of December 23, 2005, and this was the last time either of them saw Person alive. McCauley further testified that Murrell had said not to call him because he was going to be busy that night.

Murrell owned an investment property—441 South 13th Street—that was being renovated and was on the market. In that property, police found a piece of ductwork in the basement that had Person's blood on it. Nothing else in the property was found to have Person's blood or DNA on it. The basement of that investment property had been recently painted.

At the scene where the body was discovered, police found painted drywall that was consistent—meaning that it had a common source—with debris found in the basement of Murrell's investment property. Some of the drywall from the crime scene had a "multilayer" sequence of pink and green paint colors similar to drywall found at 441 South 13th Street. Animal hair plaster from the early 1900s was also found at the crime

scene, and it was consistent with animal hair plaster from the investment property, but also was consistent with animal hair plaster from another residence that was searched, and thus neither property could be scientifically determined to be the source of the plaster.

Notably, no evidence connected Murrell to the transaction that was the focal point of the Commonwealth's case—the fraudulent $20,000 loan involving Karyn Jackson, which was the alleged source of the large amount of cash that Person received around the time he was murdered. Murrell was not linked to Jackson or this transaction via PSECU membership applications, or from any of the testimony at trial. In fact, Jackson testified that she did not even know Murrell.

The only evidence possibly connecting Murrell to the loan scheme was testimony regarding two motorcycle loans linked to Nicholas Hailey. In particular, PSECU's investigator characterized these transactions as fraudulent because Hailey had defaulted on the loans, and three of the four PSECU checks were deposited into Murrell's account at another bank. One of those loans was for a motorcycle Murrell himself sold to Hailey. The other involved a motorcycle Hailey allegedly purchased from a David Aulman. Krause did not know whether repossessions had been attempted after the defaults, or whether there was an actual motorcycle sale involved in the Hailey-Aulman transaction (an actual sale would have contradicted the modus operandi of the fraud scheme).[12]

The state also relied on cell phone records and expert testimony to attempt to link Murrell to the murder. The phone records demonstrated that calls from Glover's and Murrell's phones had connected to the same cell towers around Harrisburg on the day in question, indicating a similar geographic location of the phones. However, the only

_____

[12] Murrell's alleged connection to the PSECU loan fraud scheme is discussed in greater detail in Section IV. F., infra.

37

phone that was shown to have traveled outside of the Harrisburg area into Maryland on the night of the murder was the cell phone belonging to Glover. Murrell's cell phone activity on the night of December 23rd into the morning of December 24th was limited to Harrisburg-area cell towers.

No direct evidence linked Murrell to the murder. For example, there was no fingerprint or DNA evidence that connected Murrell to the crime scene or the investment property, no murder weapon discovered, no accelerants found, nor any eyewitness testimony linking him to the killing or placing him near the locations involved on the date of the murder.

Thus, when viewing the circumstantial evidence as a whole, this is not a case with overwhelming record support of Murrell's "participation in the murder and abuse of [the] corpse." Indeed, it is quite possible that the presentation of character witnesses attesting to Murrell's good character could have tilted the balance of the scales in his favor.

As the Pennsylvania Supreme Court has repeatedly admonished, "character evidence alone may be sufficient to raise a reasonable doubt and justify an acquittal of the charges." Commonwealth v. Neely, 561 A.2d 1, 2 (Pa. 1989) (citing Commonwealth v. Scott, 436 A.2d 607, 611 & n.1 (Pa. 1981)). In fact, when a criminal defendant in Pennsylvania has produced testimony regarding his good character, he is entitled to a jury instruction to this effect. See id.; PENNSYLVANIA SUGGESTED STANDARD CRIMINAL JURY INSTRUCTIONS § 3.06(3) ("The law recognizes that a person of good character is not likely to commit a crime which is contrary to that person's nature. Evidence of good character may by itself raise a reasonable doubt of guilt and justify a verdict of not guilty."). Indeed,

in one Pennsylvania Supreme Court case finding reversible prejudice from the failure to call character witnesses, the court explained that "[e]vidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty." Commonwealth v. Weiss, 606 A.2d 439, 442 (Pa. 1992).

Because the circumstantial evidence of Murrell's guilt was far from overwhelming, and in light of the well-established view of the Supreme Court of Pennsylvania that evidence of good character is substantive and meaningful, we find that the state court's application of Strickland's prejudice prong was unreasonable as well. As such, because "we conclude that no fair-minded jurist could disagree with our finding that the [state courts'] conclusion was incorrect, we also find that the [state courts'] conclusion was an unreasonable application of Strickland." Branch, 758 F.3d at 234.

### 3. *De Novo Review*

Section 2254(d)(1) is satisfied when the state courts unreasonably apply federal law to a claim that is properly exhausted and then raised on federal habeas review. Id. Consequently, the substantial deference afforded under that section is shed and the federal habeas court must review the claim de novo. Id. at 241; Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied . . . [and the] federal court must then resolve the claim without the deference AEDPA otherwise requires." (citation omitted)).

Here, that review is fairly simple. In light of the foregoing discussion, failing to call known character witnesses was prejudicial to Murrell under Strickland's tenets. See

Section IV. A. 2., <u>supra</u>.  It is also clear that in the state-court record there appears no strategic reason to support Matangos's failure to call character witnesses on Murrell's behalf.  <u>See</u> Section IV. A. 1., <u>supra</u>.  Thus, the success of Murrell's first habeas claim turns on the strategic reasons, or lack thereof, for why Matangos did not call such witnesses at trial.

Those reasons were not developed in the state court record, but this was not the fault of Murrell, who diligently sought an evidentiary hearing on the matter.  Therefore, to decide Murrell's first habeas claim, it is necessary to do what the PCRA court should have done in the first place: hold an evidentiary hearing.  <u>See</u> <u>Branch</u>, 758 F.3d at 241-42.  Because of Murrell's diligence, such a hearing is not barred by 28 U.S.C. § 2254(e)(2).  <u>See</u> <u>Pinholster</u>, 131 S. Ct. at 1412 (Breyer, J., concurring in part and dissenting in part) ("If the federal habeas court finds that the state-court decision fails [§ 2254](d)'s test (or if (d) does not apply), then an (e) hearing may be needed."); <u>Brown v. Wenerowicz</u>, 663 F.3d 619, 629 n.4 (3d Cir. 2011) (explaining that after <u>Pinholster</u>, Third Circuit jurisprudence applying § 2254(e)(2) remains applicable where § 2254(d)(1) does not bar federal habeas relief); <u>Thomas v. Varner</u>, 428 F.3d 491, 498 (3d Cir. 2005) (finding that because habeas petitioner requested evidentiary hearing by PCRA court and request was denied, he was not at fault for failing to develop record and thus § 2254(e)(2) did not bar an evidentiary hearing).

### B.  <u>Ineffective Assistance – Failure to Impeach Abdul McCauley</u>

Murrell's second ground for relief is no less compelling than his first.  He asserts that Matangos was ineffective for failing to impeach Abdul McCauley—one of the prosecution's key witnesses—on two different grounds.  First, he claims that Matangos

should have properly impeached McCauley regarding his ownership of a vehicle that was lent to Person, which had sustained damage when Person's girlfriend—Keisha Walker—had smashed the lights out with a hammer during a domestic dispute on December 10, 2005. Second, he contends that Matangos should have impeached McCauley regarding potential cooperation and a favorable deal McCauley received on unrelated Dauphin County drug charges, which would have shown McCauley to be biased in favor of the prosecution. Both claims were fully exhausted in state court. (See Doc. 15-1 at 25-26; Doc. 48-17 at 10-11, 17-18).

As to the first claim, the police reports provided to the state courts on collateral review indicate that McCauley owned the damaged car that he denied owning at trial. (See Doc. 48-15 at 6-7, 28-33). When McCauley testified at trial that he did not own the vehicle—a fact that Matangos appeared to concede after some discussion at sidebar—there existed the possibility of impeaching McCauley on this point with the police reports if such materials were admissible under the Pennsylvania Rules of Evidence.

However, because we find the second claim in this group much more compelling, we decline to address the first claim of ineffectiveness in detail. We note, however, that upon doubly deferential review of the state court decision, it does not appear that Strickland was applied unreasonably to this claim, especially with regard to the prejudice prong. That is, it was reasonable for the state court to determine that even if McCauley had been impeached on this detail, there is not a reasonable probability of a different outcome at trial.

Murrell's stronger claim in this ground is that Matangos was constitutionally ineffective for failing to impeach McCauley on the basis of potential favorable treatment he

received (i.e., a reduced sentence) in return for testifying against Murrell and Glover.  In particular, Murrell points to Dauphin County drug charges filed against McCauley in 2006 that appear to have been significantly reduced.

Again, on appeal the Superior Court essentially affirmed the PCRA court's decision on this issue without adding any meaningful analysis, concluding that Murrell had not "refute[d] the PCRA court" and had "not shown the PCRA court's decision was wrong." (Doc. 48-17 at 10-11).  Therefore, we will look through the Superior Court's opinion to the PCRA opinion, the last reasoned decision on this issue.  Bond, 539 F.3d at 289-90; Blystone, 664 F.3d at 417 n.15.[13]

The PCRA court reviewed the documentary evidence Murrell provided, which consisted of docket sheets from several different state charges against McCauley, and determined that "no criminal matters existed in which the prosecution could provide purportedly favorable treatment."  (Doc. 15-1 at 25-26).  In particular, regarding the 2006 Dauphin County drug charges outlined in the docket sheets, the PCRA court stated that "Petitioner [sic] pled guilty and was sentenced on November 14, 2006, before the trial at issue.  Petitioner's [sic] supervision was transferred to Lehigh County, where ultimately, the Lehigh County Court revoked and resentenced McCauley. . . .  No basis exists on which to suggest that McCauley received a reduced or favorable sentence."  (Doc. 15-1 at 26).  The PCRA court then concluded that "no ineffectiveness occurred where no factual basis existed for a suggestion that the Commonwealth provided a reduced sentence in exchange for testimony."  (Doc. 15-1 at 26).

---

[13] We note that even if we focused on the Superior Court decision, the following analysis regarding § 2254(d)(2) would not change, because the Superior Court also unreasonably determined that Murrell offered no evidence to substantiate his ineffectiveness claim.  (See Doc. 48-17 at 10-11).

This decision "was based on unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It is beyond dispute that Murrell submitted documentary evidence that provided a factual basis for his claim that Matangos was ineffective for not impeaching McCauley regarding potential favorable treatment in exchange for cooperation.

In the attachments to his PCRA petition, Murrell included—among other things—the docket sheets from charges against McCauley that were filed in 2006 in Dauphin County, Pennsylvania—the county where Murrell and Glover were tried and convicted. (See Doc. 48-15 at 71-79 (docket numbers CP-22-MD-0000454-2006; CP-22-0003594-2006)). McCauley was initially charged with possession with intent to deliver a controlled substance, 35 PA. CONS. STAT. § 780-113(a)(30) (a felony); possession of drug paraphernalia, 35 PA. CONS. STAT. § 780-113(a)(16) (a misdemeanor); and a summary traffic offense.[14] (Doc. 48-15 at 71). Such charges carried a top-end aggregate sentence of eleven years' imprisonment and $105,000 in fines. 35 PA. CONS. STAT. § 780-113(b), (f)(1.1). These charges were later reduced to simple possession of a small amount of marijuana, 35 PA. CONS. STAT. § 780-113(a)(31) (a misdemeanor), and simple possession of drug paraphernalia, 35 PA. CONS. STAT. § 780-113(a)(32). (Doc. 48-15 at 75, 77). Upon pleading guilty to the reduced charges, McCauley received a mere thirty days' probation and a $50 fine. (See Doc. 48-15 at 75, 77).

We are perplexed by the PCRA court's review of Murrell's PCRA petition and supporting evidence. To conclude that there was "no factual basis" for cross-examining McCauley about potential cooperation and favorable treatment defies logic and a cursory

_____

[14] The current Pennsylvania statutes are used here, but their substance remains unchanged from the time of McCauley's relevant guilty plea and sentencing.

reading of the docket sheets. When felony and misdemeanor charges that carry a potential eleven-year prison sentence are reduced to simple possession misdemeanor charges, and the resultant sentence is thirty days' probation, it is evident that a "factual basis" on which to impeach McCauley for potential favorable treatment in exchange for testimony existed.

This situation is strikingly similar to <u>Grant v. Lockett</u>, 709 F.3d 224 (3d Cir. 2013). In that case, Grant, the defendant, had filed a § 2254 petition seeking relief from a Pennsylvania first-degree murder conviction. <u>Id.</u> at 226. At trial, the Commonwealth's key witness—Moore—had given eyewitness testimony that Grant had shot and killed the victim, providing the primary basis for Grant's conviction. <u>Id.</u> at 227.

After his conviction was affirmed by the Pennsylvania Supreme Court, Grant filed a PCRA petition. <u>Id.</u> at 228. Among other claims, Grant asserted that his trial counsel was ineffective for failing to discover and cross-examine Moore about favorable treatment Moore had purportedly received from the Commonwealth in exchange for testifying against Grant. <u>Id.</u> at 228-29. The PCRA court denied Grant's claim based on "its belief that Grant had not presented any evidence that Moore was actually on parole during the relevant time periods or that Moore received any favorable treatment by the Commonwealth in exchange for testifying against Grant." <u>Id.</u> The Superior Court affirmed, the Pennsylvania Supreme Court denied review, and the federal district court on habeas review adopted the reasoning of the PCRA court and denied an evidentiary hearing and relief. <u>Id.</u> at 229, 232.

On appeal, the Third Circuit applied the doubly deferential standard of review under § 2254(d) to this exhausted ineffectiveness-of-trial-counsel claim. <u>Id.</u> at 230.

Despite this substantial deference, the Third Circuit found that the state courts'
determination of the facts was unreasonable under § 2254(d)(2), insofar as the docket
sheets for Moore's prior convictions at issue were incorporated into the certified record.
Id. at 232-33.  Accordingly, the court found that it was "beyond dispute" that the record
before the state court supported Grant's ineffectiveness claim, and it was an unreasonable
determination of the facts to have held otherwise.  Id. at 233.

So too in the instant case.  It is indisputable that the record before the state
courts supported Murrell's ineffectiveness claim, and it was an unreasonable
determination of the facts to have held otherwise.  Consequently, like in Grant, we find that
the state courts' "factual determination simply ignored the evidence" in the record, and the
state courts' decision, "to the extent it relied upon this erroneous determination, 'was
based on an unreasonable determination of the facts in light of the evidence presented in
the State court proceeding.'"  Id. (quoting 28 U.S.C. § 2254(d)(2)).

We pause here to make several further observations.  None of these
observations affects our decision that the state courts unreasonably determined the facts
on this claim, as that conclusion is apparent from the face of the PCRA petition and the
supporting documents.  Rather, we write to point out significantly troubling aspects of the
Commonwealth's conduct in relation to the instant ineffectiveness claim.

In his § 2254 petition, Murrell included a portion of the transcript from the
preliminary hearing in which McCauley testified, which took place in Dauphin County on
November 8, 2006.  (See Doc. 15-4 at 96-104).  Murrell avers that both Matangos and
Morris were well-aware of this preliminary hearing and transcript.  Matangos, in fact, was
present at the hearing.  (Doc. 15-4 at 96).  Murrell further avers that not only did Morris

have the transcript, but Morris actually provided the transcript to Murrell in the first place. Murrell alleges that he then sent five copies of the transcript to Morris during the direct appeal and PCRA process so that the transcript could be used in the state collateral review proceedings. (Doc. 15 at 124-25, 128).

This November 8, 2006 transcript provides, in pertinent part, the following opening statement by Francis T. Chardo, the Commonwealth's representative at the hearing:

> Your Honor, before I examine Mr. McCa[u]ley, I wish to advise counsel for the Defendants [of] some information that I wish them to be aware of *for purpose of impeachment*, if they wish to take advantage of it. Mr. McCa[u]ley has a pending charge right now in Dauphin County Court, he's charged with Possession, With Intent to Deliver a Controlled Substance, and Possession of Drug Paraphernalia. The maximum penalty in the aggregate of those two offenses is 11 years of imprisonment. *I have informed him after my review of the case, that I intend to reduce the charge to . . . simple Possession, a misdemeanor, on the first count of PWI, which would carry with it up to probably 30 days of incarceration*. . . . And so he is going to be facing reduced charges, rather than 11 years, and I wish the Defense Counsel to be aware of that.

(Doc. 15-4 at 97) (emphasis added). Moreover, at the beginning of McCauley's cross-examination during this hearing by Glover's initial trial attorney, Bryan Walk, the following exchange took place:

> **Walk**: Sir, you heard Mr. Chardo speak about your charges you have, right?
>
> **McCauley**: Yeah.
>
> **Walk**: *You're getting a deal for cooperating, correct*?
>
> **McCauley**: *If you want to call it that*, but I have a lawyer that's working on my case.

**Walk**:  Well Mr. Chardo told us you would be facing 11 years, but he's going to drop PWI down to simple possession and you might get, I forget what he said 30 days, or so, something like that.  So you're going to get, and that's because of what you're doing here, let's [b]e clear about that, right?

**McCauley**:  My lawyer said he was going to get me that deal anyway.

**Walk**:  All right, so your testimony is that Mr. Chardo is just doing it out of the kindness of his heart, and not for you cooperating?

**McCauley**:  I have no idea.

**Walk**:  So you never had any discussions with anybody about providing testimony and getting a break in return on your charges?

**McCauley**:  We talked.

**Walk**:  Who's we?

**McCauley**:  Me and my lawyer.

**Walk**:  *Okay, you spoke with Mr. Chardo?*

**McCauley**:  *Yeah.*

**Walk**:  *Okay.  And he told you what he could do for you, and what he couldn't do for you?*

**McCauley**:  *Yeah, that's correct.*

**Walk**:  Okay, but did—what was your understanding of what you would get if you continued to take the stand and follow through with what you told the police, and testified here and at a future trial?

**McCauley**:  *That he could see what he could do, like in my case.*

**Walk**:  And it was contingent upon you testifying, and telling the same story here today, and the trial, you know all of that, right?

**McCauley**:  Well no, I told him I was going to do it without having him help me.

47

> **Walk**: *But you were given something in return, are we clear about that, let's just be straight up?*
>
> **McCauley**: *Yes, yeah.*

(Doc. 15-4 at 98-99) (emphasis added). In light of the relevant and material contents of this transcript, we—like Murrell—are simply at a loss for why Morris did not attach a copy of it to the PCRA petition to further support the related ineffectiveness claim.

Nevertheless, we are much more troubled by the Commonwealth's conduct throughout the litigation regarding this claim. It appears that, despite all the evidence to the contrary, the Commonwealth has consistently taken the position in its representations to the court (both state and federal) that "no factual basis" existed for impeaching McCauley at trial for purported cooperation in exchange for reduced charges.

Although we do not have a copy of the Commonwealth's brief to the PCRA court, Murrell attached portions of the Commonwealth's brief to the Superior Court on appeal from the PCRA court decision. (See Doc. 15-4 at 112-15). In that brief, the Commonwealth averred that "Murrell's arguments have no basis in fact," and argued that "counsel cannot be deemed ineffective for failing to cross-examine a witness about facts which do not exist." (Doc. 15-4 at 113-14). We can only assume that similar arguments were successfully proffered to the PCRA court, because they were also made to this court. (See Doc. 30 at 18-19).

In light of the above-referenced docket sheets and preliminary hearing transcript, we find the Commonwealth's representations deeply disconcerting. From the record, it is obvious that the Commonwealth had explicit, first-hand knowledge of the impeachment material regarding McCauley's reduced Dauphin County drug charges that Murrell has been trying to raise throughout his collateral-review proceedings. Not only

48

was the Commonwealth present at the preliminary hearing, but multiple references to this hearing were made at trial. (See, e.g., Doc. 48-4 at 31; Doc. 48-8 at 30-31). In short, the Commonwealth must have known that such facts existed. To represent to the state courts and to this court that Murrell had no factual basis for the instant ineffectiveness claim is unethical at best, and unconstitutional at worst.[15]

Nevertheless, even ignoring the preliminary hearing transcript, we find the state courts' determination of the facts regarding this claim to be unreasonable. See Grant, 709 F.3d at 233 n.4. And because § 2254(d)(2) is satisfied, we will review this ineffectiveness claim de novo. Branch, 758 F.3d at 241.

### 1. *Strickland Performance Prong*

Under the facts of this case and the relevant case law, it appears that Matangos's performance may have fallen below an objectively reasonable standard. Matangos knew about the impeachment material, yet did not raise it at trial to challenge McCauley's motivation to testify. "It is beyond the range of professionally reasonable judgment to forego investigation of, and impeachment based upon, [evidence of potential cooperation and favorable treatment] absent some apparent strategic reason that might explain or excuse counsel's failure." Grant, 709 F.3d at 234; see also Moore v. Beard, 42 F. Supp. 3d 624, 638 (M.D. Pa. 2014) ("[W]hen a witness has motivation to lie and to offer testimony favorable to the prosecution in exchange for favorable treatment, that fact 'establishes the potential bias that would [constitute] compelling impeachment evidence'

---

[15] Not only does the prosecutor, like all officers of the court, owe a duty of candor to the tribunal, see PA. RULES OF PROF'L CONDUCT r. 3.3, the government is held to a higher standard than private attorneys. That is, the prosecution's interest is to see that "justice shall be done," rather than merely "win a case." Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Bailey, 840 F.3d 99, 124 (3d Cir. 2016).

because such information would benefit a jury in assessing the witness's reliability." (alteration in original) (quoting Grant, 709 F.3d at 236)).

There are no reasons on record—strategic or otherwise—for not impeaching McCauley with this critical information. As stated above, Respondent's dubious explanation is directly contravened by the docket sheets and preliminary hearing transcript. Accordingly, we believe that Matangos should be given an opportunity to explain at an evidentiary hearing why he did not cross-examine McCauley regarding potential bias in favor of the prosecution in light of the reduced charges and probation sentence.[16]

We note, however, that providing a reasonable justification under the circumstances as they presently appear may be a difficult task. We cannot independently conceive of a reason to omit such crucial and potent cross-examination for one of the Commonwealth's most important witnesses. Moreover, there does not appear to be a downside of using this impeachment evidence, only a benefit to the defendants.

### 2. *Strickland* Prejudice Prong

We next turn to whether the failure to impeach McCauley regarding potential cooperation and favorable treatment in return for testifying resulted in prejudice. In other words, but for the failure to impeach McCauley's motivation to testify, is there a reasonable probability that the result would have been different, where a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of the trial? Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 694). We answer that question in the affirmative.

---

[16] Once again, addressing this claim in an evidentiary hearing is not barred by § 2254(e)(2), as Murrell diligently sought an evidentiary hearing on the matter in the state courts.

In addition to the less-than-overwhelming circumstantial evidence against Murrell outlined in Section IV. A. 2., <u>supra</u>, the following facts are relevant to the issue of prejudice.

McCauley was an important witness for the Commonwealth throughout its prosecution of Glover and Murrell. He gave multiple oral and written statements to the police. (<u>See</u> Doc. 48-4 at 29-30). He testified for the Commonwealth at the November 8, 2006 preliminary hearing. He established himself at trial as being Person's "best friend" for fourteen years, and best friends with Glover since 1987. He attested that on the day Person disappeared, he last saw Person alive getting into Murrell's car with Murrell and Glover. In fact, on multiple occasions at trial, he swore that the last people he saw with Person were Murrell and Glover. (<u>See, e.g.</u>, Doc. 48-4 at 73).

McCauley's testimony also indicated that when Murrell and Glover showed up in the parking lot near Sneaker Villa, they were looking for Person. (Doc. 48-3 at 65). He further testified that Murrell had said that he was going to be busy the night of December 23rd, and not to call him, seeming to infer that Murrell was planning to murder Person. (Doc. 48-3 at 67). McCauley also discussed Glover's and Murrell's history of gun ownership, and mentioned a previous altercation that Glover was involved in, prompting a motion for a mistrial from Glover's counsel. (Doc. 48-3 at 93-97).

McCauley also provided testimony damaging to Glover, which of course affected Murrell because the prosecution emphatically maintained that this was a "two-man job." (Doc. 48-12 at 90-91). He attested that Glover admitted his involvement in the loan scheme, and that Person owed Glover approximately $1,000 from the Karyn Jackson transaction. (Doc. 48-3 at 88-89). He informed the jury that Glover appeared skittish and

paranoid, and that Glover had told him not to talk to the police about the loan scheme. (Doc. 48-3 at 82-84). He testified that Glover had left the area shortly after Person's body was discovered. (Doc. 48-3 at 85-86). He, along with Aikens, attested that Glover had a small scar on his lip on December 24th that looked as if he had recently been punched in the face. (Doc. 48-3 at 74; Doc. 48-4 at 26-27).

McCauley further cast blame on Glover by describing an altercation that he had witnessed at Person's funeral, where, according to McCauley, Glover was physically assaulted and screamed "it wasn't me, it wasn't me" in relation to the murder of Person. (Doc. 48-3 at 90). McCauley then testified, "That struck me as like, if it wasn't you, who was it. Then, you know what I'm saying, why is you screaming that out." (Doc. 48-3 at 90).

The significance of McCauley's testimony was not lost on the prosecution. In its closing, the Commonwealth repeatedly relied on it to demonstrate motive for the killing, (Doc. 48-12 at 79, 87-88), to place Person in the car with Murrell and Glover on the day he was last seen alive, (Doc. 48-12 at 68-69, 78-79, 82, 91), and to incriminate Glover, (Doc. 48-12 at 79, 80, 81, 82).

Finally, at trial, McCauley directly addressed his purported motive for cooperating with the investigation and prosecution. Upon cross-examination by Glover's second trial counsel George N. Marros, McCauley testified as follows:

**Marros**: In all these statements, in all these phone interviews, you told the police the truth?

**McCauley**: That's correct.

**Marros**: Because you would have no reason to lie?

**McCauley**: No reason to lie.

**Marros**: Not protecting yourself from anything?

**McCauley**: I'm not protecting myself. I'm not, you know, the accuser. I'm just trying to get down to the bottom of this so I can, you know, explain to my best friend's father what went wrong[.]

(Doc. 48-4 at 30-31); (see also Doc. 48-3 at 82 (McCauley testifying, in response to Glover allegedly telling him to keep quiet about the loan scheme, that he was "going to tell [the detectives] whatever I got to tell them because my friend is dead. And I just didn't care. I'm telling them whatever I got to tell them for them to get to the bottom of this.")).

Upon considering the evidence as a whole, McCauley's close relationship with the defendants, the significant and incriminating nature of his testimony, the prosecution's reliance on that testimony, and the unselfish and laudable reasons McCauley proffered at trial for his cooperation (which went unchallenged), we cannot say there is not a reasonable probability that the result would have been different if McCauley had been properly impeached. The fact that McCauley had a "motive to curry the prosecution's favor" and this motive was never revealed to the jury is significant. Grant, 709 F.3d at 237-38. Without such impeachment, McCauley appeared to the jury to be an unbiased witness in search of the truth regarding the death of his best friend, with only the best intentions underlying his cooperation and testimony. In reality, it appears that McCauley had "a very compelling reason to lie," and "had the jury known of [McCauley]'s potential for bias, the Commonwealth's closing argument would have been deprived of [much of] its force[.]" Grant, 709 F.3d at 238.

As such, omission of this "crucial evidence of a possible bias" greatly undermines our confidence in the verdict. Id. Therefore, unless Matangos had a

reasonable, strategic reason for why he did not impeach McCauley with this critical information, both <u>Strickland</u> prongs will be satisfied on this claim.

C. <u>Prosecutorial Misconduct and Ineffective Assistance – Religious References Made by Commonwealth at Closing</u>

In Murrell's third ground for relief, he asserts that the Commonwealth violated his Fourteenth Amendment due process rights by making multiple religious references during its closing. He also claims that his trial counsel was constitutionally ineffective for, among other things, failing to properly object to these religious comments, failing to request a mistrial, and for failing to correct the record regarding an alleged third religious reference that does not appear in the trial transcript. This ground was fully exhausted in state court. (Doc. 15-1 at 26-28; Doc. 48-17 at 11-13).

Again, the Superior Court did not delve into the merits of the claim or add any meaningful analysis. Rather, it held that, as to the two religious references found in the trial transcript, Murrell's brief on PCRA appeal "does not set forth and . . . does not apply[] any law regarding mistrial requests and/or the concept of permissible oratorical flair. Consequently, he has not shown arguable merit to the claim that counsel should have moved for a mistrial. Thus, [Murrell] has not demonstrated the PCRA court reached an incorrect decision." (Doc. 48-17 at 12).

As to the alleged third religious reference that does not appear in the trial transcript, the Superior Court found that Murrell had failed to substantiate his claim with any evidence like an affidavit or witness certification, and therefore had failed to show error with the PCRA court's dismissal of the claim without an evidentiary hearing. (Doc. 48-17 at 12-13). In sum, it appears that the Superior Court primarily found that Murrell's collateral-review attorney had simply failed to do anything that is normally required on

appeal to show error in the PCRA court's decision. Therefore, we once again look through the Superior Court's decision to the PCRA court opinion. <u>Bond</u>, 539 F.3d at 289-90; <u>Blystone</u>, 664 F.3d at 417 n.15.

The first statement by the prosecution included the phrase, "If there are powers in this universe that watch over us and that protect . . . ." (Doc. 48-12 at 72). The second involved a reference to the victim where the prosecutor referred to Person as "it," and then corrected himself. He stated, "Getting it in a car, getting it out—God, I'm sorry for calling Wesley Person it. It's a guy, a guy with loved ones and family." (Doc. 48-12 at 91). The PCRA court quoted the two passages at issue, and found that when read in context they were not the type of prejudicial references to religion that would require a mistrial or rise to the level of prosecutorial misconduct. Therefore, the PCRA court concluded, trial counsel was not ineffective for not objecting to them or for not moving for a mistrial. (Doc. 15-1 at 26-27).

Upon deferential review under § 2254(d), we do not find the PCRA court's determination on these issues to be unreasonable. The comments made by the prosecution during closing are not the type of highly prejudicial religious references forbidden by Pennsylvania or federal law. <u>See, e.g.</u>, Commonwealth v. Chmiel, 777 A.2d 459, 466-67 (Pa. Super. Ct. 2001); <u>Commonwealth v. Chambers</u>, 599 A.2d 630, 644 (Pa. 1991); <u>Sandoval v. Calderon</u>, 241 F.3d 765, 775-77 (9th Cir. 2000); <u>Coe v. Bell</u>, 161 F.3d 320, 351 (6th Cir. 1998). In fact, the second comment, rather than being a religious reference, appears to be the prosecutor using "God" as a profanity to emphasize his remorse for referring to the victim as "it."

Furthermore, there was no unreasonable application of, or decision contrary to, the clearly established federal law related to the prosecutor's comments. The PCRA court's application of Pennsylvania law regarding allegedly improper prosecutorial comments was in line with the relevant precedent from the Supreme Court of the United States. See Parker v. Matthews, 567 U.S. 37, 45 (2012) (explaining that "the clearly established Federal law" on such issues is Darden v. Wainwright, 477 U.S. 168 (1986), which held that a prosecutor's improper comments only rise to an unconstitutional level when they "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); Reid v. Beard, 420 F. App'x 156, 160 (3d Cir. 2011) (nonprecedential) ("[Pennsylvania's] standard [regarding prosecutorial misconduct] has been found to be consistent with and materially indistinguishable from the federal one."). The PCRA court's determination that the instant comments did not amount to a denial of due process was not an unreasonable application of federal law.

As such, it was also not unreasonable to find that there was no ineffectiveness shown when failing to object to these comments or to move for a mistrial would meet neither the performance nor prejudice prong of Strickland. Thus there was no unreasonable application of Strickland either.

Finally, the state court's determination that the ineffectiveness and due process claims regarding the alleged third religious reference were meritless was not unreasonable. After reviewing the record before the state court, it is clear that Murrell provided no basis for holding an evidentiary hearing on this issue. Without providing any evidentiary basis to support the allegations of an improper third religious reference, the

state courts' denial of these claims was not unreasonable under either § 2254(d)(1) or § 2254(d)(2).[17]

### D. <u>Fifth Amendment Violation, Related Ineffective Assistance</u>

Murrell next claims that in its closing the Commonwealth impermissibly shifted the burden of proof to the defense to explain why the Commonwealth's theory was wrong, violating his Fifth Amendment right to remain silent. He also asserts that trial counsel was ineffective for failing to properly object to the comments. The Fifth Amendment claim was raised and denied in post-trial motions and then asserted on direct appeal, and appears to be exhausted. <u>Wilkerson v. Superintendent Fayette SCI</u>, 871 F.3d 221, 228-29 (3d Cir. 2017) ("A petitioner seeking § 2254 relief from a Pennsylvania conviction exhausts his state remedies for a federal claim either by raising the claim on direct appeal or in a petition for collateral relief under the PCRA."). The related ineffectiveness claim was not raised at all at the state level.

At the outset, we can dispose of the ineffectiveness claim in swift fashion. Because the claim was not raised in the state courts, it is procedurally defaulted. Thus, Murrell would have to demonstrate cause and prejudice, or manifest injustice, to permit federal habeas review. This he cannot do.

In its closing, the prosecutor stated, "When Mr. Matangos was creating this closing argument that was swirling and swirling with potshots at everybody involved in the investigation and every witness, you didn't hear a consistent, coherent explanation for how

---

[17] We decline to address Murrell's claims that Morris—direct appeal and PCRA counsel—was ineffective for not providing witness certifications or affidavits regarding the alleged third religious reference. It is well settled that there is no Sixth Amendment right to effective assistance of counsel on collateral review. <u>Coleman v. Thompson</u>, 501 U.S. 722, 752 (1991). We also find <u>Martinez</u> inapplicable because, even assuming Morris's performance was deficient in his presentation of the trial-counsel-ineffectiveness claim to the PCRA court, Murrell cannot show the prejudice required regarding the religious references.

this could possibly have happened if it wasn't Lawrence Murrell's basement?" (Doc. 48-12 at 85). Matangos immediately objected. (Doc. 48-12 at 85). The trial judge overruled this objection and told the Commonwealth to proceed. (Doc. 48-12 at 85).

Murrell contends that the "cause" that would permit federal review of this defaulted trial-counsel-ineffectiveness claim is ineffective assistance of initial-review PCRA counsel for not raising the claim on PCRA review. See Martinez, 566 U.S. at 17. But trial counsel's actions did not fall below an objectively reasonable standard—Matangos objected to the comments as soon as they were made. While the explanation he provided for his objection was not textbook, the Strickland standard does not require perfect representation. See Richter, 562 U.S. at 110 (citing Strickland, 466 U.S. at 687). It merely requires "reasonably competent" performance that does not fall below the "range of competence demanded of attorneys in criminal cases." Strickland, 466 U.S. at 687 (citation omitted). Matangos satisfied that standard when he promptly objected to the prosecutor's comments. As such, Morris was not ineffective for choosing not to raise this meritless claim in the PCRA petition, and therefore there is no cause to excuse the procedural default.

Murrell's other primary claim in this ground for relief is that his Fifth Amendment right to remain silent was violated when the Commonwealth suggested that Murrell had the burden to disprove his guilt. This violation allegedly occurred when the Commonwealth made the above-quoted statement about the absence of a different explanation for Murrell's investment property being utilized in the murder. Murrell interprets this statement as the prosecutor basically saying to the jury that "while trial counsel was attempting to deceive/fool you . . . he [] did not explain this property and

because no explanation was suggested, I'm correct, thus, find Mr. Murrell [g]uilty, because he has not explained himself." (Doc. 15 at 209).

This burden-shifting prosecutorial misconduct claim was presented to the trial court in a post-sentence motion. (<u>See</u> Doc. 15-1 at 60). The post-sentence motion was denied by operation of law, but the trial court's reasoning as to its denial of this claim appeared in its Rule 1925 opinion filed in response to Murrell's statement of issues complained of on direct appeal. (<u>See</u> Doc. 15-1 at 60).

On direct appeal, the Pennsylvania Superior Court found that Murrell had waived the claim. (Doc. 48-14 at 11-13). The court reasoned that trial counsel's "objection failed to raise with sufficient specificity the claims that he now presents on appeal." (Doc. 48-14 at 13). For this proposition, the Superior Court cited Pennsylvania Rule of Evidence 103(a)(1), which deals with preserving a claim of error in relation to a ruling to admit or exclude evidence. This citation is perplexing, though, because the statement at issue was made by the prosecutor in his closing argument, which is decidedly not evidence. <u>See</u> <u>Commonwealth v. Bronshtein</u>, 691 A.2d 907, 918 (Pa. 1997); <u>Commonwealth v. Cook</u>, 676 A.2d 639, 649 (Pa. 1996). We fail to see how Rule 103(a)(1) applies to objections to prosecutorial closing remarks.

Moreover, the Superior Court deemed the claim waived despite the fact that a contemporaneous objection was made at trial, the claim was raised with specificity in Murrell's 1925(b) statement of errors complained of on appeal, and the trial court did not discuss waiver in its opinion but rather addressed the merits of the claim. Nonetheless, citing Pennsylvania Rule of Appellate Procedure 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."), the Superior Court

found that Murrell had waived this argument on the basis of Pennsylvania Rule of Evidence 103.

In any event, because the Superior Court did not address the merits of the claim, we look to the last reasoned state court decision, which is the trial court opinion. Citing Commonwealth v. Kennedy, 959 A.2d 916, 924 (Pa. 2008), the trial court found that the comments were mere "oratorical flair" and did not rise to the level of substantial prejudice required for granting relief on a claim of prosecutorial misconduct. (Doc. 15-1 at 71-72).

Although we disagree that making comments regarding a criminal defendant's failure to rebut the Commonwealth's evidence or to provide a different theory of the case is mere "oratorical flair," we nonetheless find that the trial court did not unreasonably apply, or come to a conclusion that was contrary to, the clearly established federal law regarding prosecutorial misconduct. The comment at issue was an isolated incident, and it was immediately objected to by defense counsel. Moreover, it was not a direct comment on Murrell's decision not to testify. Thus, in the context of the trial as a whole, it was reasonable to find that such a comment did not "infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 169 (1986).[18]

---

[18] We note that it is possible that the Superior Court's finding of waiver stripped the trial court opinion of any preclusive effect it may have had, thus requiring de novo review by this court rather than § 2254(d) deference. See Shotts, 724 F.3d at 375 (explaining that Superior Court's reliance on procedural bar to collateral claim "stripped the [lower] court's substantive determination . . . of preclusive effect" thus requiring de novo review by the federal habeas court (second alteration in original) (citation omitted)). Even if that were the case, under de novo review our conclusion that this claim must be denied would not change. The prosecutor's comments here do not rise to the level required by Darden v. Wainwright, 477 U.S. 168, 169 (1986).

E.  Ineffective Assistance – Failure to Present Alibi (Work Records)

Murrell next claims that his trial counsel was ineffective for failing to present employment records from the week of December 19, 2005, to December 23, 2005, at trial. Murrell asserts that these records would have provided an alibi to counter the testimony of McCauley and Aikens that placed him in the vehicle with Person and Glover on the afternoon of December 23rd.  This claim was not raised at the state court level, and therefore is procedurally defaulted.

Murrell maintains that he can establish cause and prejudice to excuse the procedural default.  He claims that the Martinez exception and ineffectiveness of initial-review PCRA counsel for not raising the claim would permit him to assert this claim for the first time on federal habeas review.  However, after review of the record, including Murrell's consolidated petition and attached exhibits, it does not appear that Murrell can show ineffectiveness of either trial or initial-review collateral counsel, and therefore Murrell cannot meet the requirements of Martinez.

Murrell's relevant time cards and time sheets were obtained from his employer by the police during the investigation.  (See Doc. 15-5 at 60-62).  On the time card for the week in question, it reflects that on Friday, December 23, 2005, Murrell punched in at 1:45 p.m. and then punched out at 8:29 p.m.  (Doc. 15-5 at 62).  However, it was reported that on the accompanying time sheet for that week there is no starting time or finishing time listed.  (Doc. 15-5 at 61).

There are multiple reasons why this alibi defense would reasonably be abandoned.  First, eyewitness testimony of McCauley and Aikens explicitly contradicts the time card, as they both put Murrell in his car by Sneaker Villa around 3:30 or 4:00 p.m. on

December 23rd.  Second, the payroll time sheets that were kept in conjunction with the time cards reportedly contradict the time card "in" and "out" times because the time sheet has no recorded start or finish time for Murrell on December 23rd.  Third, the cell phone associated with Murrell was recorded as making three calls from three different cell phone towers in Harrisburg between 4:00 p.m. and 5:00 p.m., which would indicate movement around Harrisburg rather than being stationary at his place of employment.  Finally, the clock-out time of 8:29 p.m. on December 23rd is earlier than the four preceding days by approximately an hour and a half, and does not conflict with Commonwealth's timeline for the murder.

Thus, it is apparent from the record that there were multiple strategic reasons to abandon this alibi defense.  As such, it cannot be said that Matangos's performance was objectively unprofessional at trial, nor can it be said that Morris acted unprofessionally by failing to claim to the PCRA court that Matangos was ineffective on this point.  Neither claim has merit, and thus <u>Martinez</u> is not satisfied.  And, as there is no cause to excuse the procedural default of this claim, the claim must be denied as defaulted.

F.  <u>Ineffective Assistance – Failure to Impeach and Present Exculpatory Evidence Indicating an Absence of Motive</u>

Murrell's sixth ground for relief asserts that trial counsel was ineffective for failing to impeach the Commonwealth's bank-investigator witness and for failing to present exculpatory evidence to rebut the Commonwealth's theory regarding motive.  This claim was not raised in the state courts, and thus is procedurally defaulted.  Murrell, however, contends that he can establish cause and prejudice to excuse the procedural default.

As explained above, the Commonwealth argued at trial that Person was murdered because he had received a large amount of cash from the Karyn Jackson transaction and had not shared that money with the other loan-scheme participants. At trial, the PSECU investigator connected Murrell to the loan scheme through two motorcycle loans procured by Nicholas Hailey and an allegedly forged check from Rodney Person. Murrell claims that had there been effective cross-examination and presentation of exculpatory evidence, it would have been apparent that he was not involved in the loan scheme and thus had no motive to murder Person.

Under the Martinez exception, ineffectiveness of initial-review collateral counsel can provide the "cause" to excuse a procedural default of a substantial trial-counsel-ineffectiveness claim. See Section III. D., supra. Murrell contends that Morris's failure to raise this ineffectiveness-of-trial-counsel claim at the PCRA level provides the cause necessary to excuse the procedural default.

Murrell makes the following relevant allegations regarding ineffectiveness of both Matangos and Morris: (1) Matangos possessed documentary evidence obtained in discovery showing that three of the six people associated with Murrell through the PSECU membership applications—Travis Morgan, Derek Novell, and Karlsheen Marks—did not have loans from PSECU, let alone defaulted loans; (2) at least Morgan and Novell were available and willing to testify to show that they did not take out any loans and were not involved in any type of fraudulent activity; (3) Matangos possessed documentary evidence showing that Nicholas Hailey had made payments on his motorcycle loans before defaulting, contrary to the way the scheme operated; (4) Matangos possessed documentary evidence showing that Rodney Person was current on his loan payments,

contrary to the way the scheme operated; (5) Morris was aware of the aforementioned documents and witnesses, and was explicitly instructed by Murrell to raise this issue in the PCRA petition. (Doc. 15 at 253-56, 260, 262).

Murrell also attached supporting evidence and affidavits to his instant habeas petition. The exhibits include PSECU records demonstrating that Morgan, Novell, and Marks did not have loans from PSECU, (Doc. 15-5 at 81, 82, 85); affidavits from Novell and Morgan averring that they had never received any loans from PSECU, were available as witnesses at trial, and were never contacted or interviewed by Matangos or Morris, (Doc. 15-5 at 93-95); PSECU records from Nicholas Hailey containing lower principal balances than the initial loan amounts testified to at trial, indicating that payments had been made on the loans, (Doc. 15-5 at 80); a detailed affidavit from Hailey attesting to Murrell's good character, the details of the two motorcycle purchases Hailey made with the PSECU loans, the details of the transactions regarding the checks made out to Hailey that were deposited into Murrell's account, Hailey's availability and willingness to testify at trial, and that he was never contacted or interviewed by Matangos or Morris, (Doc. 15-5 at 91-92); PSECU records demonstrating that Rodney Person was current on his auto loan payments for a 1992 Mazda, (Doc. 15-5 at 86); an affidavit from Murrell averring that he asked Matangos to call witnesses with specific knowledge of the bank transactions that were purportedly fraudulent, (Doc. 15-5 at 96); and supplemental filings with the Dauphin County court indicating that Murrell had wanted to assert this issue on state collateral review but believed his PCRA counsel (Morris) was not going to raise it despite Murrell requesting he do so, (Doc. 15-5 at 97-99).

Murrell's underlying trial-counsel-ineffectiveness claim, distilled, is that Matangos was deficient at trial because he failed to show that Murrell was not involved in fraudulent loan activity and thus had no motive to kill Person. According to Murrell's habeas petition allegations, supported by the attached exhibits, Matangos had the information available to investigate and counter Krause's testimony and the prosecution's theory on motive, but failed to do so. Accordingly, if Morris was ineffective for failing to raise this claim in the PCRA petition, and if the claim has some merit, this otherwise-defaulted claim would be cognizable on federal habeas review. <u>Lambert v. Warden Green SCI</u>, 861 F.3d 459, 473-74 (3d Cir. 2017) (citing <u>Martinez</u>, 132 S. Ct. at 1318).

Here, we find that Murrell has adequately shown that Morris, PCRA counsel, was ineffective for failing to assert a substantial ineffectiveness-of-trial-counsel claim in the initial state-collateral-review proceedings. We will briefly examine the <u>Martinez</u> prongs.

<em>1. Ineffective Assistance of Initial-Review Collateral Counsel</em>

First, as PCRA counsel, Morris had available the trial transcript, which makes clear that the prosecution's only theory on motive was the loan scheme. (<u>See, e.g.</u>, Doc. 48-12 at 66 (prosecution, in closing argument, stating, "I made a decision early on in this case to present . . . the entire picture, and the entire picture is part of the fraud [sic]. That's the motive behind this whole enterprise."); Doc. 48-12 at 91 (prosecution, in closing argument, stating, "The bank fraud shows their mutual interest in what was in Wesley Person's pocket.")). The transcript also succinctly outlined the ways Krause attempted to connect Murrell to the loan scheme, primarily through Hailey's two motorcycle loans. Moreover, the prosecution relied exclusively on Krause's testimony to attempt to show that Murrell was "in the middle of this bank fraud scheme," that Person

had "ripped *these guys* off" and had taken the cash without "kick[ing] up what was supposed to be kicked up." (Doc. 48-12 at 87, 89) (emphasis added).

Second, the discovery documents show the PSECU members linked to Murrell through membership applications do not appear to be involved in the loan scheme. As explained above, the PSECU records reveal that almost all of these members had no loans or were current on their loan payments.

Finally, even a cursory investigation, like speaking with Nicholas Hailey, would have revealed that the Commonwealth's linchpin for Murrell's involvement in the scheme could have been rebutted with witness testimony and PSECU records. Hailey's affidavit avers that both motorcycle purchases were legitimate, no fraud was ever involved, payments were initially made but then he defaulted on the loans due to financial inability to pay, and that he was available and willing to testify to all of these facts. (Doc. 15-5 at 91-92). Most importantly, Hailey's affidavit directly addresses the checks made payable only to Hailey and deposited in Murrell's account—the primary basis for Krause claiming that Murrell was involved in the loan scheme. According to Hailey's sworn statement, Murrell deposited those checks in his bank account but then gave all of that money to Hailey, essentially doing Hailey a favor by cashing the checks. (Doc. 15-5 at 91).

As such, it is evident that Morris's representation fell below prevailing professional norms when he failed to investigate and include this trial-counsel-ineffectiveness claim in the PCRA petition. Morris possessed all the relevant information tending to show that Murrell had no motive to murder Person, information that was presumably also available to Matangos for presentation at trial. It also appears that

Murrell—while incarcerated—was able to contact Hailey and obtain a detailed affidavit, something that would be much easier for an attorney to do, especially without the constraints of prison.  We cannot discern any objectively reasonable strategy for Morris to fail to investigate, or decide not to raise, this potentially meritorious claim.  Nor has the Commonwealth offered any possible reason.

Furthermore, as to prejudice, it is likely that the result of the proceeding—the state collateral review process—would have been different.  Had Morris competently raised and supported this ineffectiveness claim, there is a reasonable probability that PCRA relief would have been granted.

2. *Underlying Trial-Counsel-Ineffectiveness Claim is Substantial*

As to the second <u>Martinez</u> prong, it is evident that the underlying trial-counsel-ineffectiveness claim is substantial.  From the trial transcript and the evidence Murrell provided, there is some (if not a great deal of) merit to Murrell's assertion that if Matangos would have properly challenged Krause's testimony regarding Hailey's loans and presented exculpatory witness testimony, the Commonwealth's basis for Murrell's motive to kill Person would have evaporated.

It almost goes without saying that by removing the motive to commit the murder, there is a reasonable probability that the outcome of Murrell's trial would have been different.  When a case is purely circumstantial, and "[f]rom beginning to end the case is about who committed the crime," it is clear that "motive is key."  <u>House v. Bell</u>, 547 U.S. 518, 540 (2006).

The merit of this trial-counsel-ineffectiveness claim is further buttressed by two critical facts: (1) Matangos, in his opening statement, told the jury that from the

evidence that would be presented by the Commonwealth, they would see that Murrell had nothing to do with the PSECU loan scheme, (Doc. 48-2 at 55-56); and (2) Matangos himself, on cross-examination, raised the issue of whether there was any indication— through the PSECU members affiliated with Murrell—that Murrell was involved in the scheme, (Doc. 48-10 at 4). These are not insignificant matters.

As the Third Circuit has explained, "The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure." <u>Glenn v. Wynder</u>, 743 F.3d 402, 411 (3d Cir. 2014) (quoting <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 166-67 (3d Cir. 1993)). The same rationale surely applies when counsel promises that evidence will not be produced by the prosecution, and yet such evidence is seemingly delivered by a prosecution witness in response to counsel's own prompting.

It was damaging to Murrell when the Commonwealth's witness responded to Matangos's question about having evidence of Murrell's involvement with the loan scheme by stating, "It's interesting that you asked me that question because, yes, I do," (Doc. 48-10 at 4), and then discussing Hailey's two loan transactions. Matangos's failure to rebut this testimony with PSECU records or witness testimony compounded that damage.

In fact, during redirect and closing, the Commonwealth took full advantage of Matangos's apparent misstep, arguing that Hailey's defaulted loans established Murrell's involvement with the scheme and his motive to murder Person. (<u>See</u> Doc. 48-10 at 13-15 (redirect); Doc. 48-12 at 87 ("[Person] had ripped them off. Them off. [Glover]'s involvement in this bank fraud scheme, Lawrence Murrell. Well, Mr. Matangos stepped right into that one. You have no evidence of Lawrence Murrell's involvement in this bank

fraud scheme. Yes, I do. What? Nicholas Hailey. There's two default[ed] loans on motorcycles. Where were the checks cashed? Lawrence Murrell's account. That's right there. He's in the middle of this bank fraud scheme.")).

Therefore, Murrell can satisfy both prongs of the <u>Martinez</u> exception in order to establish cause. For the reasons stated above regarding the substantiality of the underlying trial-counsel-ineffectiveness claim, he is also able to show prejudice. Consequently, procedural default of this substantial trial-counsel-ineffectiveness claim is excused. And because the procedural default is excused, Murrell can raise the claim with this court for a merits analysis. <u>Lambert</u>, 861 F.3d at 473-74 (citing <u>Martinez</u>, 132 S. Ct. at 1318).

### 3. <u>De</u> <u>Novo</u> Review of <u>Strickland</u> Claim

Once again, we cannot proceed without hearing from Matangos as to why he did not challenge Krause's testimony or the Commonwealth's theory on motive with documentary evidence or witness testimony. He may have had a strategic reason, or perhaps not. Until that matter is explored at an evidentiary hearing, the <u>Strickland</u> performance-prong determination cannot be made.

Lastly, we will omit any discussion of the <u>Strickland</u> prejudice prong at this time. We note, however, that the foregoing analysis regarding the substantiality of the underlying trial-counsel-ineffectiveness claim demonstrates that prejudice can most likely be established. <u>See, e.g.</u>, <u>Bey</u>, 856 F.3d at 244 (explaining that, after providing thorough analysis of whether underlying trial-counsel-ineffectiveness claim was "substantial" under <u>Martinez</u>, "little additional discussion" was required when assessing the merits of the claim after excusing procedural default).

G. Ineffective Assistance – Failure to Impeach Commonwealth Witnesses
Regarding Mislabeling of Evidence

Murrell's seventh ground for relief is based on the way that the physical evidence was labeled and presented to the Commonwealth's expert for testing. According to Murrell, several of the items on the police inventory lists are identified as being seized from 1424 State Street (Glover's and Murrell's residence), but were labeled as being from 441 South 13th Street (Murrell's investment property) when sent to the lab for testing. One of those allegedly mislabeled items was the debris containing painted drywall that was determined by the trace-evidence expert to be consistent with paint found beneath Person's body. See Section I., supra (recounting expert testimony of Cassandra Burke). Murrell contends that Matangos was ineffective at trial when he failed to raise these labeling issues and to challenge the relevant testimony of the Commonwealth's witnesses.

Murrell did not assert this claim at the state level, and thus it is procedurally defaulted. Murrell again claims that he can establish cause and prejudice to excuse the default, but this time he is incorrect.

Murrell contends that the "cause" to excuse the procedural default is grounded in the Martinez exception, and argues that his PCRA counsel was ineffective for not raising and preserving the underlying trial-counsel-ineffectiveness claim on initial state collateral review. However, because we find that the underlying trial-counsel-ineffectiveness claim is not substantial, Murrell cannot meet the requirements of Martinez, and thus cannot excuse the procedural default of this claim.

With his consolidated habeas petition, Murrell appended several relevant documents from discovery. Those documents include portions of the Baltimore County Police Department "property inventory supplement" from the various police searches,

(Doc. 15-5 at 101-02), and a portion of the report from the "Trace Analysis Unit" laboratory examination, (Doc. 15-5 at 103-04).

Relevant to this claim, on the property inventory supplement, item number 55 is described as "Box Contractors Grade Garbage Bags (1424 State St. Inventory # 19)." (Doc. 15-5 at 102). Item number 37 is described as "Box/Empty Model JCP 40 SW-Poly HiPoint (1424 State St: Inventory # 1) containing paperwork and accessories." (Doc. 15-5 at 101). Item number 36 is described as "Debris[,] Basement Wall Sample (441 13TH St: Inventory # 6)." (Doc. 15-5 at 101). Item number 35 is described as "Duct Work[,] Piece of Open Round Duct (441 13TH St: Inventory # 5)." (Doc. 15-5 at 101). The property inventory supplement was submitted by Detective Kenneth Lang, ID # 3607. (Doc. 15-5 at 101-03).

On the Trace Analysis Unit examination report, the first page lists the different locations from where the items were collected, the particular items that were examined, the corresponding item-identifying numbers (which appear to be a combination of the collecting officer's ID number and the item number from the property inventory supplement), and a description of the item. (Doc. 15-5 at 103). In the examination report, under the heading of items collected from "441 13TH STREET," are items number "3607-036 paint can marked 'debris sample,'" number "3607-037 paper bag containing large quantity of unknown debris," and number "3607-055 paper bag containing box of contractor grade bags." (Doc. 15-5 at 103). In the "Results of Examination/Analysis" section, item number "3607-037.1 (debris from 441 13th Street)" containing pink and green paint on drywall is found to be consistent—or from a common source—with pink and green paint from the crime scene. (Doc. 15-5 at 104).

As Murrell points out, the police inventory supplement and the trace analysis examination lab report do not appear to match up. The inventory supplement states that items 37 and 55 were collected from 1424 State Street, not 441 South 13th Street. Furthermore, the police inventory supplement states that item 37 was an empty gun box, while the lab report indicates that item 37 was a paper bag containing debris—in particular, painted drywall that was consistent with paint found beneath Person's body.

We agree with Murrell that such discrepancies are troubling, especially when it involves the collection location of material evidence and descriptions of that evidence. We also agree that such inconsistencies, which appear to indicate some type of labeling error in the chain of custody from evidence collection to laboratory examination, could be fertile grounds for cross-examination. Where we disagree with Murrell is the significance of the discrepancies.

First, the contractor-grade trash bags had no bearing either way on the case. Thus, the fact that the lab report listed them as being from 441 South 13th Street rather than 1424 State Street implies some sort of error, but an inconsequential one. The mislabeling could have occurred on the request form sent to the lab. In any event, impeachment regarding this inconsistency would have yielded little, if any, benefit to Murrell, as the trash bags were not material or relevant to the case.

The discrepancy with the debris containing painted drywall is more serious, but ultimately insubstantial. From the Dauphin County police inventory lists, (Doc. 15-5 at 177-78), which Murrell also appended to his consolidated petition, six items were seized from 441 South 13th Street. In particular, item number 4 is debris from the basement floor along the south wall, item number 5 is the piece of ductwork from the basement floor, and

item number 6 is a debris sample from the basement north wall.  (Doc. 15-5 at 177-78).  These inventory lists match the trial testimony of the detective involved in the evidence collection.  (See Doc. 48-6 at 15-16).  They also appear to match the portion of the property inventory supplement Murrell included.  (See Doc. 15-5 at 101 (item # 35 and item # 36)).

Although Murrell did not attach the full property inventory supplement, it does not appear that debris from 1424 State Street was collected and tested like it was from 441 South 13th Street.  Rather, the debris at issue in the expert report was almost certainly collected from the basement of 441 South 13th Street, and thus properly treated as such in the lab report.  While Murrell did not attach the second page of the property inventory supplement, it appears that item number "34" on the supplement would have been the debris from the basement floor at 441 South 13th Street (item number 4 on the Dauphin County inventory list of that address).  Cross-examination of the collecting officer would most likely have yielded a simple explanation regarding how the debris evidence may have been mislabeled as "3607-037" on the laboratory request form when in reality it likely should have been labeled as "3607-034."

Pointing out that material evidence was possibly mislabeled in the chain of custody may have initially created some doubt in the eyes of the jury.  Nevertheless, on cross-examination the collecting officer could have provided a simple explanation and confidently testified as to the proper origin of the painted drywall debris.  Consequently, even assuming that Matangos was deficient in failing to bring out the above-referenced

discrepancies at trial, Murrell cannot show that prejudice resulted from that failure.[19]

Therefore, the underlying claim of trial counsel ineffectiveness is not substantial, the

Martinez exception is not satisfied, and this claim must be denied as procedurally

defaulted.

> H.  <u>Prosecutorial Misconduct & Ineffective Assistance – Testimony of Aikens
> Regarding Identity of Driver</u>

Murrell's next ground for relief involves portions of the testimony of Steven

Aikens.  Aikens initially testified on direct and cross that Murrell was driving the car on

December 23rd when Murrell and Glover picked up Person from Sneaker Villa.  (Doc. 48-

10 at 29, 36, 67; Doc. 48-11 at 8).  Aikens eventually conceded—after being confronted

with his earlier statements to police—that Glover was actually driving, and that Aikens had

in fact recently told the prosecutor that Glover, not Murrell, had been driving.  (Doc. 48-11

at 13-15).

Murrell contends that his Fourteenth Amendment due process rights were

violated when the prosecutor elicited known false testimony from Aikens and did not

correct it.  He also claims that Matangos was ineffective for failing to move for a mistrial

after the alleged prosecutorial misconduct.

This ground for relief was not raised in the state courts, and therefore is

procedurally defaulted.  Murrell concedes as much, but again asserts that he can

demonstrate cause and prejudice to excuse the default, relying directly and indirectly on

the Martinez exception to show cause.

---

[19] Murrell also suggests that the paint and plastic evidence should have been suppressed and that Matangos was ineffective for failing to move to suppress this evidence.  (<u>See</u> Doc. 15 at 272).  As this is an entirely different claim, is not developed at all, and was not raised in the state courts, we consider it procedurally defaulted and decline to address it.

First, to the extent that Murrell claims the "cause" for the procedural default of the due process claim was ineffective assistance of direct appeal counsel, (see Doc. 15 at 296), that assertion is meritless. The alleged prosecutorial misconduct was not objected to or otherwise preserved during trial. Even assuming that Morris was ineffective for not raising an unpreserved due process claim on direct appeal, which is doubtful, that claim of appellate ineffectiveness would first have to be raised in state collateral review. See Murray v. Carrier, 477 U.S. 478, 488-89 (1986) (explaining that ineffective assistance can be cause for procedural default, but exhaustion doctrine "generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default").

If the appellate-ineffectiveness claim was not raised in state collateral review proceedings, it would be procedurally defaulted and could not be raised in a federal habeas petition unless the petitioner could show cause and prejudice to excuse the default. But, as Davila makes clear, the Martinez exception does not extend to underlying claims of appellate ineffectiveness. 137 S. Ct. 2058, 2065 (2017). Therefore, Murrell cannot utilize the Martinez exception to show cause to excuse the default of his claim of appellate ineffectiveness for not raising the prosecutorial misconduct due process claim on direct appeal.

Murrell's other claim in this ground is that Matangos was constitutionally ineffective for not moving for a mistrial in response to the alleged misconduct of knowingly eliciting false testimony. He further asserts that PCRA counsel was ineffective for not raising this claim in initial state collateral review proceedings, thus providing the cause to excuse the procedural default. We find, however, that the underlying trial-counsel-

ineffectiveness claim cannot meet the substantiality prong of the <u>Martinez</u> exception, and therefore this claim must be denied as procedurally defaulted.

It is true that Aikens initially testified that Murrell was driving and then changed his tune upon being confronted with his previous statements to police. But Matangos was not constitutionally ineffective for not moving for a mistrial. To the contrary, Matangos, through effective cross-examination, was able to get Aikens to concede that his earlier trial testimony—where he forcefully asserted that Murrell was driving—was mistaken. (<u>See</u> Doc. 48-11 at 12-15). Matangos also elicited testimony tending to show that Aikens knew he was testifying untruthfully earlier, which would undercut Aikens' credibility. (<u>See</u> Doc. 48-11 at 14-15).

Moreover, it is highly unlikely that a motion for a mistrial would have had any chance for success. Just because Aikens testified that he had informed the prosecutor "a couple days ago" that Glover was driving, (Doc. 48-11 at 15), does not make that assertion true. As Aikens' vacillating testimony exemplifies, his credibility was questionable. And, despite Murrell's argument to the contrary, the issue of who was driving the car when it arrived at Sneaker Villa does not appear to be a material matter. Furthermore, it is the job of defense counsel, not the prosecutor, to challenge the Commonwealth witness's credibility with prior inconsistent statements. Here, Matangos did just that, and therefore did not perform below prevailing professional norms.

In sum, there does not appear to be any trial-counsel ineffectiveness regarding this portion of Aikens' testimony, and thus Murrell does not raise a substantial underlying trial-counsel-ineffectiveness claim. Because it is not a substantial underlying

claim, Murrell cannot meet the second prong of the <u>Martinez</u> exception, cannot show cause for the procedural default, and therefore this ground for relief must be denied.

  I. <u>Ineffective Assistance – Failure to Challenge DNA Evidence</u>

  Murrell's ninth ground for relief generally asserts that Matangos was ineffective for failing to challenge the Commonwealth's DNA evidence at trial.  This claim was exhausted in state court.  (<u>See</u> Doc. 15-1 at 29-30; Doc. 48-17 at 14).  Therefore, the "doubly deferential" standard of review for <u>Strickland</u> claims applies.  <u>Richter</u>, 562 U.S. at 101.

  On appeal from the PCRA court decision, the Superior Court affirmed the PCRA court, holding that because Murrell "d[id] not identify any expert or any particular scientific theory that could have been presented on his behalf . . .," he "ha[d] not established the PCRA court was wrong."  (Doc. 48-17 at 14).  As this opinion does not supplement the PCRA court opinion in any meaningful way, we will apply § 2254(d)'s standards to the PCRA court decision on this issue.  <u>Bond</u>, 539 F.3d at 289-90; <u>Blystone</u>, 664 F.3d at 417 n.15.

  The PCRA court found that Murrell had failed to establish ineffectiveness of trial counsel because he had not proffered a basis for why trial counsel should have retained a DNA expert to counter the Commonwealth's expert.  (Doc. 15-1 at 29-30).  The PCRA court also pointed out that the statistical conclusions from the DNA expert regarding the correlation between the DNA from the ductwork and Person's DNA were "overwhelming," thus mitigating the lack of defense expert testimony about the inconclusive results from the lighter thumbwheel.  (Doc. 15-1 at 30).

The PCRA court conclusions regarding the effectiveness of trial counsel were not unreasonable. Murrell, through his PCRA counsel, proffered no reason why a defense DNA expert should have been retained beyond speculation about what a defense DNA expert analysis might be able to show. In his PCRA petition, Murrell argued that a DNA expert should have been retained to independently "evaluate the alleged biological evidence" presented by the Commonwealth's DNA expert and possibly "produce exculpatory evidence, namely that the DNA evidence found on the lighter thumbwheel was not that of" the co-defendants. (Doc. 48-15 at 11-12).

Such speculation is a far cry from establishing that trial counsel was constitutionally deficient for not retaining a DNA expert. Defense attorneys do not always have to employ expert testimony; rather, "it depends on the specific circumstances of the case." Showers v. Beard, 635 F.3d 625, 633 (3d Cir. 2011). Here, Murrell did not demonstrate why a DNA expert should have been retained; he merely claimed that such an expert might have arrived at different conclusions than the Commonwealth's expert. That may be true, but it might equally be true that the expert would have reached the same conclusions.

If such bare assertions were grounds for ineffectiveness, it would create a blanket rule that a counter-expert must always be retained by defense counsel. This is not the law. See, e.g., Richter, 562 U.S. at 106-08; Showers, 635 F.3d at 633; Commonwealth v. Chmiel, 30 A.3d 1111, 1143 (Pa. 2011) ("Trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony [that] was presented by the prosecution." (alteration in original) (quoting Commonwealth v. Marinelli, 810 A.2d 1257, 1269 (2002))). As such, it

was not unreasonable for the PCRA court to find this trial-counsel-ineffectiveness claim meritless.

Murrell also spills a great deal of ink claiming that it was never determined with absolute certainty that the substance on the ductwork was actually blood. He alleges that both luminol and phenolphthalein tests have the potential for false positive results, and that the Commonwealth's DNA expert was only concerned with the DNA sample results and not their origin. Thus, as his argument goes, Matangos was ineffective for not retaining an expert to testify that the DNA on the ductwork could have come from another source (like urine or saliva), and that the two chemical tests performed by the Commonwealth's witnesses could have been false positives.

This theory was not raised as part of his DNA ineffectiveness claim at the state level, and it does not appear that Murrell can demonstrate cause and prejudice to excuse the default. It is undisputed that the Commonwealth's witnesses testified that the positive luminol test on the ductwork suggested the presence of blood, the ductwork sample was tested with phenolphthalein to verify the presence of blood and this test was also positive, and then a swab was sent to the DNA expert who determined that the sample contained DNA that matched the DNA of Person. These tests, taken together, strongly imply that the substance was blood and not a series of false positives.

As explained above, bare assertions that Matangos should have retained an expert to counter the Commonwealth's experts' findings and testimony simply will not suffice to establish that the underlying ineffectiveness claim is substantial. Nothing in Murrell's petition or exhibits demonstrates that this claim of ineffective assistance of trial

counsel has some merit, and therefore the claim must be denied as procedurally defaulted.

### J.   Ineffective Assistance – Failure to Sever Trial

Murrell next asserts that his trial counsel was ineffective for failing to move to sever the trial.  This claim is also procedurally defaulted, and Murrell attempts, once again, to utilize the Martinez exception to establish cause to excuse the default.

We will deny this claim.  It is clear that Murrell has not shown that the underlying ineffective-assistance-of-trial-counsel claim has some merit.  His allegations regarding how trial counsel's purportedly deficient performance prejudiced him, (see Doc. 15 at 326-27), fall far short of the Strickland prejudice standard.  In particular, his sworn allegations that Glover would have chosen to testify in a severed trial and would have testified that he dropped Person off alone after picking him up from Sneaker Villa, (see Doc. 15-5 at 121), have little support in fact.  Rather, it is much more probable that Glover would not have testified even if the trials had been separate.

### K.   Ineffective Assistance – Failure to Present Exculpatory Evidence Regarding Motive for Someone Else to Murder Person

Murrell's eleventh ground for relief involves claims of alleged ineffectiveness of trial counsel for failing to present exculpatory evidence indicating that others may have had a motive to kill Person.  Most of the claims were exhausted in the state courts.  (See Doc. 15-1 at 24-25; Doc. 48-17 at 14-17).

Once more, the Superior Court relied primarily on the PCRA court's rationale as well as PCRA counsel's failure to provide any legal authority to support the assertions made on appeal.  (See Doc. 48-17 at 14-17 (summarizing the PCRA court's analysis of this claim, and concluding that Murrell's brief on appeal "does not set forth any legal

authority governing considerations of speculative evidence, relevance, hearsay, or any other aspect of evidence law[,] . . . does not apply the law of evidence to his factual proffer(s)," and therefore "fails to show error in the PCRA court's reasoning[.]")).[20]

Therefore, because the Superior Court opinion does not supplement the PCRA court's decision in any meaningful way, we will again look through the Superior Court's opinion to the PCRA decision. Bond, 539 F.3d at 289-90; Blystone, 664 F.3d at 417 n.15. We also review the exhausted claims on the record that was before the state courts. Cullen v. Pinholster, 563 U.S. 170, 185 (2011).

The gist of the claims advanced in state collateral review was that police records and other discovery evidence tended to show that Keisha Walker—Person's live-in Harrisburg girlfriend—had a motive to murder Person. The PCRA petition alleged that trial counsel was constitutionally ineffective for failing to properly admit and present available evidence that purportedly implicated Walker in Person's murder. (Doc. 48-15 at 5-6; Doc. 15-1 at 24). The following is a summation of the evidence provided to the PCRA court in support of these claims.

The first piece of evidence is a January 6, 2006 Baltimore County Police Department investigation report by Detective Lang recounting a phone interview with Kendra Caroline Jordan ("Jordan") that took place on December 29, 2005. (Doc. 48-15 at 17). Jordan was a resident of Brooklyn, New York, who claimed to be Person's long-time

---

[20] We note that we are at a loss for why PCRA counsel would present a claim on appeal without citing any supporting legal authority, especially when the issue involves the admissibility of evidence. According to the Superior Court, this occurred multiple times on PCRA appeal. Such actions do not appear even minimally competent under prevailing professional norms. See, e.g., Commonwealth v. Johnson, 985 A.2d 915, 924-25 (Pa. 2009) (finding that failure to explain why trial court erred in admitting evidence along with failure to provide "*any* citation to any authority" contravened Pennsylvania Rule of Appellate Procedure 2119(a) and failed to preserve issue for appellate review).

girlfriend.  (Doc. 48-15 at 17).  According to the report, Jordan had recently learned of Person's death from McCauley, and had information for the police regarding threatening voicemails she had received from an unknown female caller claiming to be Person's girlfriend in Harrisburg.  (Doc. 48-15 at 17).

Jordan reported that she was most concerned about a message received two days earlier (December 27, 2005) from the same unknown female caller, stating "that's what he gets for giving me herpes."  (Doc. 48-15 at 17).  Jordan further reported to Detective Lang that she had been dating Person regularly for the past six years, and that "she did not know who the female caller was and was unaware of any other female companions involved with" Person.  (Doc. 48-15 at 17).

The report goes on to state that Detective Lang received permission and Jordan's voicemail pin number, accessed the voicemails, recorded them onto a cassette tape, and secured the tape as evidence.  (Doc. 48-15 at 17-18).  Detective Lang ended the report by describing the expletive-laden content of the threatening messages, noting that the female caller identified herself as Person's female companion from Harrisburg and concluding that "it was the same female caller" leaving each of the threatening messages. (Doc. 48-15 at 18).

The next piece of evidence is an investigation report dated January 17, 2006, from Detective Lang, also involving Jordan.  (Doc. 48-15 at 19).  In that report, Detective Lang recounted a December 30, 2005 phone conversation with Jordan where she stated that she had just received another threatening phone call from the same unknown female caller.  (Doc. 48-15 at 19).  "According to Jordan, the unknown female had threatened her by saying that victim Person 'got what he deserved' for messing

around with the wrong girl and that if she [Jordan] did not mind her own business, she'll be next." (Doc. 48-15 at 19).

During this conversation, Jordan also told Detective Lang that she had learned that Person had been living with a "Keisha" in Harrisburg and believed that it was Keisha Walker who had been leaving the threatening messages. (Doc. 48-15 at 19). Detective Lang noted that he was unable to verify that information because the caller had blocked her cell phone identification information. (Doc. 48-15 at 19).

Also appended to the PCRA petition was the second page of another investigation report dated January 17, 2006, regarding a police interview with Arnetia Walker.[21] (Doc. 48-15 at 21). According to Arnetia, she and Keisha had been at a club in Baltimore in October or November of 2005 and had encountered McCauley, Glover, and Person. (Doc. 48-15 at 21). Arnetia did not believe this was a coincidence, but rather that Keisha was following Person and "checking-up on him." (Doc. 48-15 at 21). When asked if she knew anyone named "Kendra," Arnetia told Detective Lang that "Keisha Walker knew about 'Kendra' through victim Person and was supposed to have been calling her 'playing on the phone' between October and November 2005." (Doc. 48-15 at 21).

Three other pieces of evidence were included in the PCRA petition that allegedly indicated that Keisha Walker had intimate knowledge of the murder that was not publicly available. First, there was a dispatch report from the Steelton Police Department regarding a phone conversation with Keisha Walker held at 8:41 a.m. on December 28, 2005. (Doc. 48-15 at 23). Officer Robert Gaither reported that Walker had told him that she had seen a sketch of the victim on the news that she thought might have been Wesley

---

[21] Arnetia Walker is referred to as Keisha Walker's mother in some documents, (see, e.g., Doc. 48-15 at 4), but in others she is identified as Keisha's sister, (see, e.g., Doc. 15 at 340, 351). Murrell asserts that Arnetia is Keisha's sister.

Person, whom she had recently reported missing. (Doc. 48-15 at 23; see also Doc. 48-15 at 32). Walker had told Officer Gaither "that the person she saw on the news *had been shot in the head* somewhere in the area of the Mason Dixon line" between Pennsylvania and Maryland. (Doc. 48-15 at 23) (emphasis added).

The second document was an investigation report from Detective Lang dated March 29, 2006, indicating that he had spoken with Officer Gaither on December 30, 2005, and had also received a written statement from him. (Doc. 48-15 at 24). This report also recounted that Walker had told Officer Gaither that "she had observed a news broadcast of a sketch of a[n] unidentified [black male] found near the 'Mason Dixon Line' who *had been shot in the head*." (Doc. 48-15 at 24) (emphasis added).

The third document is an article dated January 5, 2006, from the Patriot News, a Harrisburg newspaper, regarding the discovery of Person's body. (Doc. 48-15 at 26). According to the article, "Bill Toohey, a spokesman for Baltimore County, would not say how many times Person was shot or *the location of his wounds*. [Toohey] said that means *only the killer would have that information*." (Doc. 48-15 at 26) (emphasis added). The article also stated that police had "circulated a sketch of the victim's face in Baltimore newspapers and on TV." (Doc. 48-15 at 26).

Finally, attached to the PCRA petition were several Harrisburg Police records documenting a domestic dispute between Person and Walker shortly before Person's death. (Doc. 48-15 at 28-33). According to one report, on December 10, 2005, police were dispatched to 340 Swatara Street (Person's and Walker's residence) for an active domestic dispute. (Doc. 48-15 at 31). Upon arrival, officers discovered that Walker and Person had "got[ten] into a verbal argument and Keisha took a hammer and struck

the vehicle that Wesley was trying to leave in.  She broke out the two front parking lights and the driver[']s side tail light."  (Doc. 48-15 at 31).

In another report from 9:24 p.m. on December 27, 2005—the report in which Walker called Steelton Police to report Person missing—"Walker stated that her and Person[] have been having problems, however on December 23, 2005 at approx[imately 11:59 p.m.], Person[] did give a kiss and stated that he would see her later.  That was the last time she saw him."  (Doc. 48-15 at 32).  The report also mentions that a previous police dispatch report showed "a domestic at that address involving both parties.  During that fight, Walker did break out three lights on [Person's] car."  (Doc. 48-15 at 32).

In the PCRA petition, Murrell—through PCRA counsel Morris—argued, in part, that "[t]rial counsel was ineffective for failing to introduce evidence of the voice mails left on Kendra Jordan's phone regarding a possible motive to kill Wesley Person."  (Doc. 48-15 at 4).  The petition also noted that during trial, evidence had been proffered that Aikens heard Keisha Walker yell at Person that "you burned me, that's why you're burning. You see this bump on my lip." (Doc. 48-15 at 4 (citing N.T. 904)).  The prosecution had objected to the introduction of this statement as hearsay, and the trial court had sustained that objection.  (Doc. 48-15 at 5).  The petition then alleged that "trial counsel was ineffective for, at that time, failing to argue that the evidence sought to be entered was exculpatory evidence."  (Doc. 48-15 at 5).  It is unclear whether this last allegation of ineffectiveness related only to the hearsay statement, or both the hearsay statement and the audio recordings of the threatening voicemail messages.

The PCRA court found that no ineffectiveness was shown by trial counsel "refraining from seeking introduction of speculative and inadmissible evidence of an

alleged motive of the victim's girlfriend." (Doc. 15-1 at 24). First, regarding failure to call Jordan as a witness, the court reasoned that "no proper evidentiary basis existed on which the trial court would have allowed Ms. Jordon [sic] to testify as to the content of the anonymous voice messages. Counsel's assertion that the call originated from the victim's girlfriend Keisha Walker, amounts to speculation." (Doc. 15-1 at 24). Thus, the PCRA court concluded, trial counsel was not ineffective for failing to call Jordan as a witness because she "could not have testified to the voice messages in support of a motive theory." (Doc. 15-1 at 24).

While we disagree with many of the PCRA court's evidentiary conclusions,[22] the court's application of Strickland was not unreasonable, or contrary to clearly established federal law. Murrell's PCRA petition provides no legal justification for the

---

[22] Evidence showing that a third party—here, of a different gender than both defendants—had a motive to kill the victim generally is relevant in a murder trial under Pennsylvania law. See Commonwealth v. Ward, 605 A.2d 796 (Pa. 1992) (explaining that "it is well[ ]established that proof of facts showing the commission of a crime by someone else is admissible" because "although motive is not an essential element of the crime, it is always relevant and admissible" (citation omitted)). Moreover, any hearsay concern regarding the admissibility of the contents of the voicemail recordings is misplaced because those recordings do not meet the definition of hearsay. Although the recordings were statements that "the declarant d[id] not make while testifying at the current trial or hearing," they were not being offered "to prove the truth of the matter asserted." PA. R. EVID. 801(c). To wit, the voicemail contents were not being offered to show that Person "got what he deserved," that he gave someone "herpes," or that Jordan's life was in danger. Rather, their purpose was to show that an unidentified female appeared to be pleased that Person was dead and had a motive to kill him. Notably, this female caller also seems to have had knowledge that was not yet publicly available, as it appears that she knew Person had been killed when she called Jordan on December 27, 2005—before that information was released to the public via the Baltimore County press release and related news broadcasts. (See Doc. 48-15 at 17-18). In fact, even when the information regarding the murder was first released to the press, Baltimore County police still did not know the identity of the victim. Accordingly, the contents of the recordings would not be barred by the general rule against hearsay because they do not meet the threshold hearsay definition. See, e.g., Commonwealth v. Young, 748 A.2d 166, 176 (Pa. 2000) (holding that out-of-court statements implicating defendant in escape scheme were not hearsay because they were not offered to prove involvement in scheme but rather motive to kill a scheme co-conspirator to prevent his cooperation with authorities); Commonwealth v. Puksar, 740 A.2d 219, 225 (Pa. 1999) ("[S]tatements are admissible to establish ill-will or motive where they are not being offered for the truth of the matter contained therein."). Although it may be true that Jordan could not have testified that the female caller was Keisha Walker, it would have been permissible for Jordan or Detective Lang to have testified about the contents of the voicemails.

admission of the proffered evidence beyond stating that it was "exculpatory evidence." It is not the PCRA court's job to create arguments or justifications for a criminal defendant's claim of ineffectiveness of trial counsel; rather, the defendant has the burden to demonstrate that post-conviction relief is due. See, e.g., Commonwealth v. Cox, 983 A.2d 666, 678 (Pa. 2009) (citing 42 PA. CONST. STAT. § 9543(a)(2)); Strickland, 466 U.S. at 687. When PCRA counsel provides no legal justification for why trial counsel was allegedly ineffective for failing to present evidence or successfully argue for its admission, it is reasonable to find that the defendant has not met his burden to establish that trial counsel performed below constitutional requirements.

We find that this same reasoning applies to the other preserved ineffectiveness claims that make up this eleventh ground for relief. Neither the PCRA court nor the Superior Court unreasonably applied, or came to a conclusion contrary to, clearly established federal law, i.e., Strickland. We do, however, write to address a few important issues raised in this complex ground for relief.

First, contrary to the PCRA court, we would not so easily dismiss Murrell's allegations of trial-counsel ineffectiveness regarding Keisha Walker's apparent knowledge of the location of the fatal gunshot wounds when that information may not have been publicly available. At the very least, we would not have constructed what appears to be an insurmountable hurdle to pursue this claim.

The PCRA record demonstrates that Keisha Walker contacted the Steelton police at 9:24 p.m. on December 27, 2005, to report that Person was missing. (Doc. 48-15 at 32). Less than twelve hours later, at 8:41 a.m. on December 28, 2005, Walker contacted the Steelton police again to report that she saw a television news broadcast

with a sketch of an unidentified black male who "had been shot in the head" and who she thought could be Person.  (Doc. 48-15 at 23).  The substance of this phone conversation was relayed to the Baltimore County police, and that report likewise recounted that Walker had told police the victim "had been shot in the head."  (Doc. 48-15 at 24).  The PCRA record also included a Harrisburg news article from January 5, 2006, in which a spokesperson for Baltimore County stated that he would not say how many times Person was shot or the location of the gunshot wounds, and that "only the killer would have that information."  (Doc. 48-15 at 26).

Testimony at trial from several prosecution witnesses also supported the police-report contents.  Aikens testified that he learned about Person's death when, on the morning of December 28, 2005, Walker called him around 5:00 a.m. and told Aikens to turn on the news, "and that's when we seen [Person's] face on the news."  (Doc. 48-10 at 43).  Detective Edwards also testified that the Baltimore County police had released a sketch of the victim to the media because they had been unable to identify the body.  (Doc. 48-5 at 72).  According to Detective Edwards, this media release resulted in the call from Walker on December 28th that helped to identify Person, and prompted the police to travel to Harrisburg to "speak to her about it."  (Doc. 48-5 at 72, 83).

In his PCRA petition, Murrell alleged that trial counsel was ineffective for failing to "confront Ms. Walker with her knowledge of the injuries to Mr. Person, along with the evidence which suggests that she had knowledge of the crime that had not been made public prior to her reports to law enforcement."  (Doc. 48-15 at 5).  The PCRA court dismissed this claim of ineffectiveness, reasoning that Murrell's "argument requires the court to assume that no information regarding discovery of the body was reported by

another source, which could have provided the basis of Walker's knowledge." (Doc. 15-1 at 25).

Again, in light of PCRA counsel's inadequate development of this claim, the PCRA court's denial is not unreasonable. We do, however, agree with Murrell that the PCRA court's reasoning implies that Murrell was required to prove a negative to advance his claim, i.e., somehow show that "no information regarding discovery of the body was reported by another source [that] could have provided the basis of Walker's knowledge." We observe, as do the Pennsylvania Supreme Court and the Third Circuit, that such an evidentiary task is "virtually impossible." See Commonwealth v. DeHart, 516 A.2d 656, 668 (Pa. 1986); Lupyan v. Corinthian Colls. Inc., 761 F.3d 314, 322 (3d Cir. 2014) ("The law has long recognized that [proving a negative] is next to impossible."). But the broader point of the PCRA court's decision is clear and reasonable—something more needed to be done at the PCRA level to establish a basis for this ineffectiveness claim.

The PCRA court's summary disposal of this claim thus begs the question of what, if any, investigation Murrell's attorneys performed in light of the above-referenced evidence. Indeed, it is not a far-fetched reading of the PCRA petition to find that this claim basically asserts that Matangos was ineffective for failing to investigate and present any of this evidence regarding Walker or another female having a motive for, and detailed non-public knowledge of, Person's murder.

Presumably, there are a limited number of television news stations in the central Pennsylvania area that could have broadcast the news report that Walker allegedly saw. It is extremely likely that those stations archive their news footage. According to the police records attached to the PCRA petition, the broadcast in question must have aired

sometime during the morning hours of December 28, 2005.  Thus, it would be a fairly simple task for an attorney to perform a cursory investigation into whether: (a) the Baltimore County spokesman was incorrect and gunshot-location information had actually been included in the media press release; (b) the press release was silent about those details but one or more local news broadcasts contained that information (either because the information was received from a source other than Baltimore County or because the news program simply misreported the details); or (c) no relevant news broadcast that morning said anything about the location of Person's fatal gunshot wounds.  If, after a reasonable investigation, the answer was "c," significant questions would have been raised about the source of Walker's gunshot-location knowledge, requiring some follow-up action by the attorney.  But as the PCRA court noted, no such evidence like this was provided to support the claim on collateral review.[23]

Our second observation is that Murrell appears to raise a new claim in this portion of his consolidated habeas petition that was not presented to the state courts.  He points out that in the December 27, 2005 police report when Walker contacted Steelton police to report Person as missing, Walker is quoted as saying that she last saw Person at 11:59 p.m. on the night of December 23, 2005.  (Doc. 48-15 at 32).  According to the report, although she and Person had been "having problems, . . . Person[] did give a kiss and stated that he would see her later.  That was the last time she saw him."  (Doc. 48-15 at 32).

---

[23] Respondents appear to agree that such an investigation could have raised a genuine issue of material fact, noting that "[s]ince Officer Gaither [of the Steelton police] failed to contact every news network accessible from Walker's television to determine whether any of the networks broadcasted such a story, [Murrell] has failed to raise a genuine issue of material fact" requiring an evidentiary hearing.  (Doc. 30 at 14).

Person's body was found on fire in Maryland at approximately 1:30 a.m. on December 24, 2005. At Murrell's trial, the prosecution repeatedly argued that the testimony of McCauley and Aikens demonstrated that Person was last seen alive with Murrell and Glover during the afternoon of December 23rd, and emphasized how important this evidence was. (See Doc. 48-12 at 68, 69, 78, 79, 82 (prosecutor's closing argument)). Murrell now claims that trial counsel was ineffective for failing to get the "crucial information"— Walker last seeing Person alive and well at 11:59 p.m. on December 23rd—to the factfinder in an admissible form.

As this trial-counsel-ineffectiveness claim was never raised at the state court level, it is procedurally defaulted. Unless cause and prejudice, or manifest injustice, can be shown, we cannot entertain the claim.

We do not downplay the facial significance of the police report indicating that Keisha Walker—not Murrell or Glover—was the last reported individual to see Person alive in Harrisburg (and very shortly before his death). We cannot agree, however, that Murrell has carried his burden to excuse default of this claim. Murrell attempts to rely on Martinez to show cause, but falls short because he cannot demonstrate that the underlying trial-counsel-ineffectiveness claim is substantial.

Although the December 27, 2005 police report raises questions about who actually last saw Person alive and when, the report also raises a number of issues bearing on its materiality. Murrell seems to believe that the police report is indisputably true and unequivocally admissible to prove his innocence. But, contrary to those assumptions, there are questions of the report's admissibility as it contains multiple layers of hearsay. There are also questions about whether Officer Anthony Minium (the report's author) or

Keisha Walker would have affirmed the details of the report under oath or would have contested their accuracy. No affidavits or other certifications have been provided to verify the information in the report. As such, Murrell has not demonstrated that the underlying trial-counsel-ineffectiveness claim has some merit. And because he has not satisfied the second prong of the <u>Martinez</u> exception—to say nothing of the first—he cannot show cause to excuse his default of this claim.

In sum, we must deny this ground for relief. The state court did not unreasonably apply <u>Strickland</u> to the claims that were raised, and the claim that was not raised at the state level is procedurally defaulted.

### L. <u>Ineffective Assistance – Failure to Assert *Batson* Challenge</u>

In Murrell's next ground for relief, he argues that trial counsel was ineffective for failing to assert a challenge under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). This claim is procedurally defaulted as it was not raised at the state-court level. Murrell again contends <u>Martinez</u> allows him to raise this claim now, but that argument is meritless.

Once more, Murrell cannot show the underlying trial-counsel-ineffectiveness claim is substantial. That is because he has failed to establish a prima facie <u>Batson</u> claim.

To assert a claim under <u>Batson</u>, a defendant must first "make a prima facie showing that a peremptory challenge has been exercised on the basis of race." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 328 (2003). To make a prima facie showing, the defendant must demonstrate that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." <u>Johnson v. California</u>, 545 U.S. 162, 168 (2005) (quoting <u>Batson</u>, 476 U.S. at 93-94). Specifically, the defendant must show that "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's

race," and that "these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."  Id. at 169 (quoting Batson, 476 U.S. at 96).

Here, Murrell alleges that only one black person was in the pool of prospective jurors, and that this black female was excused because she had been robbed in the 1980s.  (Doc. 15 at 374).  He claims that the prosecutor did not "even use[] a strike on her."  (Doc. 15 at 374).  As such, there is no Batson claim, because the prosecutor did not "exercise[] peremptory challenges to remove from the venire members of the defendant's race."  Johnson, 545 U.S. at 169 (quoting Batson, 476 U.S. at 96).

Because there is not even a prima facie showing of a Batson claim, trial counsel could not have been ineffective for failing to assert a Batson challenge. Therefore, the underlying trial-counsel-ineffectiveness claim has no merit, the second prong of Martinez is not satisfied, cause has not been established to excuse default, and this claim must be denied as procedurally defaulted.

M.  Prosecutorial Misconduct & Ineffective Assistance – Various Prosecution Comments During Closing

The gravamen of Murrell's thirteenth ground for relief is that the prosecutor made inappropriate comments during closing that violated Murrell's right to due process, and trial counsel was ineffective for failing to properly address those comments.  This claim was not raised in state court, and is procedurally defaulted.  Murrell again attempts to rely on Martinez to show cause to excuse his procedural default, but is unsuccessful.

Murrell's argument focuses primarily on multiple statements made by the prosecutor that the victim was tied up and that this supported the first-degree murder and conspiracy charges.  (See Doc. 48-12 at 71, 72, 75, 87).  Murrell points to the autopsy

report by the medical examiner that determined that the victim was not bound, but rather the materials around the victim's wrists were remnants of burnt clothing. (See Doc. 48-7 at 7-8 (testimony of medical examiner Dr. Zabiullah Ali)). Murrell claims that the prosecutor had this autopsy report and purposefully lied about the victim being bound to sure up the case. Murrell also argues that Matangos insufficiently addressed this issue at trial.

We disagree, and find that both claims in this ground for relief must be denied. First, we deny—as procedurally defaulted—the prosecutorial misconduct due process claim for the same reasons we denied Murrell's previous prosecutorial misconduct due process claim involving the testimony of Steven Aikens. See Section IV. H., supra (discussing how Martinez cannot be utilized to establish cause to excuse the default of a prosecutorial misconduct due process claim that was not raised on direct appeal or in the PCRA petition).[24]

We further observe that this due process claim has no merit. The prosecutor was permitted to rely on the trial testimony of Kathi Michael, the forensic technician who testified that from her direct observations of the crime scene, she believed the victim's hands were bound. (See Doc. 48-5 at 21). While certainly the testimony of the expert medical examiner who performed the autopsy could carry more weight, the prosecutor was permitted to comment on Michael's testimony during his closing argument. As the trial court correctly concluded, the weight to be applied to the conflicting testimony was the province of the jury. (Doc. 48-12 at 75).

---

[24] We also apply this rationale in denying the other various claims of prosecutorial misconduct alleged in this ground for relief. (See Doc. 15 at 394-99).

We further find that the related ineffectiveness-of-trial-counsel claim is also meritless, and thus cannot satisfy the second prong of the Martinez exception. Matangos objected to the prosecutor's comments as stating facts not in evidence, arguing that the medical examiner had "testified very specifically [that] there was no binding on his wrists." (Doc. 48-12 at 75). The trial court overruled this objection. (Doc. 48-12 at 75). Thus, Matangos does not appear to have performed below prevailing professional norms regarding these comments during closing. Consequently, the claim of trial-counsel ineffectiveness is not substantial, Murrell cannot satisfy the second prong of the Martinez exception, and this ineffectiveness claim must be denied as procedurally defaulted.

N. Ineffective Assistance – Failure to Present Exculpatory Evidence Regarding Search Results of Murrell's Car

The next ground for relief argues that trial counsel was ineffective for failing to present evidence that a search was conducted of Murrell's car and no incriminating evidence was found. This claim was not raised in the state courts, and is procedurally defaulted. Murrell contends that the Martinez exception allows him to raise this claim on federal habeas review, but he is incorrect.

The underlying claim of ineffectiveness of trial counsel is not substantial. Even assuming that failure to present this evidence was deficient performance, it is clear that Murrell cannot show prejudice under the second Strickland prong.

Even if the jury had heard that Murrell's car was free of incriminating evidence, the simple fact that a different vehicle could have been used for the murder would have been readily apparent. Moreover, the clean-search evidence would not have affected the prosecution's theory of the case. Consequently, because Murrell has not shown that the underlying ineffectiveness claim is substantial, he cannot satisfy the

second prong of the <u>Martinez</u> exception, and this claim must be denied as procedurally defaulted.

O. <u>Cumulative Error</u>

Murrell's fifteenth ground for relief asserts cumulative error. As his nearly 500-page habeas petition demonstrates, Murrell believes there were numerous errors at his trial and beyond. He claims that even if each of those errors, when viewed in isolation, does not establish the requisite prejudice entitling him to a new trial, when viewed as a whole the prejudice threshold is satisfied. He also provides a comprehensive recitation of his complaints, spanning fourteen pages of his petition. (Doc. 15 at 421-34).

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." <u>Collins v. Sec'y of Pa. Dep't of Corr.</u>, 742 F.3d 528, 542 (3d Cir. 2014). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." <u>Albrecht v. Horn</u>, 485 F.3d 103 (3d Cir. 2007) (citation and internal quotation marks omitted). A cumulative error claim, like other constitutional claims presented on federal habeas review, is "subject to exhaustion and procedural default." <u>Collins</u>, 742 F.3d at 541.

Murrell did not raise a separate cumulative error claim at the state court level, and thus this claim is procedurally defaulted. Murrell fails to set forth any reason why this default should be excused. Accordingly, Murrell's failure to show cause and prejudice to excuse procedural default is fatal to his cumulative error claim. <u>Id.</u> at 543.

We further note that at this point, there are no individual constitutional errors to cumulate to show prejudice rising to the level of a due process violation. It is true that some of Murrell's claims are substantial and require an evidentiary hearing. But so far we have not held that there were errors that individually failed to provide the requisite prejudice for habeas relief such that we could aggregate them in this claim. See Ragan v. Horn, No. 2:00-cv-2092, 2016 WL 1241771, at *10 (E.D. Pa. Mar. 29, 2016) ("The cumulative error doctrine requires the existence of 'errors' to aggregate. Absent such errors . . . , the cumulative error doctrine does not apply." (citation and internal quotation marks omitted)).

P. Fourth Amendment Violation & Ineffective Assistance – Search Warrant

Murrell's sixteenth ground for relief generally asserts that the state violated his Fourth Amendment rights by searching his investment property without probable cause to support the search warrant, and therefore the fruits of the illegal search should have been suppressed. He also contends that trial counsel was ineffective for failing to raise this claim. Both claims are procedurally defaulted.

We will summarily deny the freestanding Fourth Amendment claim. The law is well settled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976); Marshall v. Hendricks, 307 F.3d 36, 81 (3d Cir. 2002) (quoting Stone, 428 U.S. at 494).

Here, Murrell had an opportunity to fully and fairly litigate this Fourth Amendment claim in the state courts. There was no "structural defect in the system itself"

that prevented Murrell from raising a Fourth Amendment claim at trial or on direct appeal. Marshall, 307 F.3d at 82. Although he argues that his attorneys were constitutionally deficient for not asserting this argument at the state-court level, that is a different constitutional claim. Therefore, his freestanding Fourth Amendment claim cannot provide a basis for relief under § 2254 and must be denied.

His related claim of trial-counsel ineffectiveness must also be denied. Murrell has failed to show cause and prejudice to excuse the procedural default of this claim. Although he attempts to rely on the Martinez exception to show cause, that attempt again falters because he cannot show that the underlying trial-counsel-ineffectiveness claim is substantial.

Murrell contends that the affidavit of probable cause in support of the warrant to search his investment property contained material misstatements and falsehoods and, if those errors were corrected or removed, the remaining affidavit would fail to establish probable cause. To support this claim, he compares statements in the affidavit to testimony from trial. (See Doc. 15 at 439-41). Murrell's argument misses the mark.

First, a cursory review of the affidavit, which Murrell provided with his § 2254 petition (see Doc. 15-5 at 166-70), shows that there is a "substantial basis for concluding that probable cause existed" for a search warrant. United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Second, the affidavit of probable cause was signed and submitted in February 2006, only a few months after Person's death. Simply because some averments in that affidavit do not align with trial testimony two years later does not necessarily mean those statements were intentionally false or provided in bad faith. Finally, even if the alleged discrepancies in the

affidavit were removed or modified to reflect the trial testimony, that affidavit of probable cause would still likely be sufficient for a search warrant.

Accordingly, trial counsel cannot be said to have been constitutionally deficient for failing to challenge the legality of the search warrant, as such a challenge would almost certainly have been a fruitless endeavor. And because Murrell has not shown that the underlying trial-counsel-ineffectiveness claim has some merit, he cannot meet the requirements of the Martinez exception to permit federal habeas review of this claim. We therefore will deny the claim as procedurally defaulted.

Q. Sufficiency of the Evidence

Murrell's final ground for relief challenges the sufficiency of the evidence for all three of his convictions. He exhausted this claim in the state court system. See (Doc. 48-14 at 6-9); Commonwealth v. Murrell, 8 A.3d 898 (Pa. 2010) (table).

We must apply the "twice-deferential standard" when reviewing a state court's rejection of a sufficiency challenge. Parker v. Matthews, 567 U.S. 37, 43 (2012). The first level of deference invokes the well-established standard of Jackson v. Virginia, 443 U.S. 307, 319 (1979), which requires "viewing the evidence in the light most favorable to the prosecution," and then asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The second layer of deference requires that, while keeping in mind the Jackson standard, the federal habeas court must consider whether the state-court "decision was objectively unreasonable." Parker, 567 U.S. at 43 (citation and internal quotation marks omitted). Reasonableness is determined based on the record evidence at the time of the state-court adjudication.

Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011) (citing Cullen v. Pinholster, 563 U.S. 170, 186 (2011)).

On direct appeal, the Superior Court reviewed the elements of Murrell's crimes of conviction, recounted the evidence adduced at trial, and concluded that the record evidence was sufficient to support each charge. (Doc. 48-14 at 6-9). We decline to rehash the Superior Court's work. Rather, after review, we conclude that the state court's rejection of Murrell's sufficiency challenge was not objectively unreasonable. Parker, 567 U.S. at 43. While the circumstantial evidence in this case was certainly not overwhelming, finding such evidence sufficient to support a jury verdict of guilty was a reasonable conclusion. Therefore, we will deny this final claim.

V.        Conclusion

In light of the foregoing, we are compelled to hold an evidentiary hearing regarding three of Murrell's habeas claims: ground A (ineffectiveness of trial counsel for failure to call character witnesses), ground B (ineffectiveness of trial counsel for failure to impeach McCauley regarding potential favorable treatment in exchange for cooperation), and ground F (ineffectiveness of trial counsel for failure to impeach and provide exculpatory evidence regarding absence of motive). Pursuant to 28 U.S.C. § 2254 Rule 8(c) and 28 U.S.C. § 2254(h), we will appoint counsel to represent Murrell during these proceedings. This evidentiary hearing will be scheduled as soon as practicable by further order.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge